OAKLEY, Plaintiff in error, v. STATE, Defendant in error.

*November 29, 1963—January 21, 1964.*

For the plaintiff in error there was a brief and oral argument by *J. Richard Long* of Beloit.

For the defendant in error the cause was argued by *William F. Donovan,* district attorney of Rock county, with whom on the brief were *George Thompson,* attorney general, and *William A. Platz* and *Robert D. Martinson,* assistant attorneys general.

DIETERICH, J. The sole issue involved on appeal is whether there is credible evidence in the record upon which a jury could be convinced beyond a reasonable doubt that defendant Oakley was guilty of the crime of attempted rape. No issue is raised on this appeal as to the charge of impersonating a peace officer.

The testimony of the complaining witness, Mrs. ————, revealed the following facts. Mrs. ———— was driving north on Highway 51 between Beloit and Janesville on a Sunday morning at approximately 6:45 a. m. It was daylight, and although there was some haze, visibility was good. Mrs. ———— testified that there was little traffic on the highway at that hour. As she was driving toward Janesville, the defendant Donald Oakley, who was driving a 1941 model pickup truck, passed her and slowed down, crowding Mrs. ———— off the traveled portion of the highway and onto the shoulder. Oakley stopped his truck directly in front of Mrs. ————, walked back to her car and asked her through the open car window whether she knew the speed limit in that area. She replied that the speed limit was 50 miles per hour and then testified as follows:

"*A.* He said I was going faster than 50 and he said I'd better move the car off the road, and he moved his truck and then I noticed he had taken my car keys. By that time I became suspicious, when he came back I asked who he was. . . . He said he was in charge in this area. He said, I am

in charge in this area, he said could I see your driver's license . . .

"Q. As this man came up to the car, you were behind the steering wheel, is that correct? A. Yes.

"Q. Was the window up or down? A. The window was down.

"Q. And what did he say? A. He asked me if I knew what the speed limit was there.

"Q. You told him you did? A. Yes.

"Q. And then what happened? A. He said I was going faster and I said I couldn't have been, I had looked at the speedometer, and he opened the car door and said he'd better move the car off the road and that he would check my speedometer.

"Q. You automatically moved over without any further comment as he opened the door? A. He pushed me over said he wanted to move the car off the road so that he could check the speedometer.

"Q. You didn't say anything to him about moving the car? A. No, he surprised me when he opened the door—I had no reason to believe he was anything other than what he said he was.

"Q. He didn't say he was an officer did he? A. No—he acted like one.

"Q. In what way did he act like one? A. His manner at the time he talked about the speed limit that was just as I would expect a policeman to do."

According to Mrs. ———, Oakley was not wearing a uniform, but was dressed in clean, well-pressed blue jeans and a light-blue sport shirt.

After they had traveled five or six blocks north on Highway 51, Oakley turned east on the Avalon road leading to Janesville. He drove on Avalon road for about five or six blocks and stopped the car. Mrs. ——— was then asked:

"Q. And all that time were you and he talking together? A. No. I had asked for identification, he had said I have it here and other than that, I asked three times for that, and other than that there was no conversation."

She testified that she asked Oakley for identification after he had stopped the car on Avalon road and that he then put his hands on her shoulders. Mrs. ——— continued her testimony as follows:

"*Q*. Did he continue to keep his hands on your shoulders? *A*. Yes, he had them on me all the time.

"*Q*. Did he do anything else? *A*. He tried to kiss me, he had one hand around my shoulder, it would be his right hand and with his left hand he tried to pull up my skirt.

"*Q*. What were you doing during this period of time? *A*. Trying to push him away and plead with him to please let me go.

"*Q*. Did you make any attempt to get out the door of the automobile? *A*. I couldn't—the position I was in.

"*Q*. Why not? *A*. My back was against the door and I would have had to reach behind me. . . .

"*Q*. Did he attempt to touch any other portion of your body during this particular period of time? *A*. He tried to open my blouse, he did get one button open.

"*Q*. Did he make any attempt to reach inside your blouse? *A*. Yes, I pushed his hand away. . . .

"*Q*. In the course of this conduct, was there any conversation between you and the defendant? *A*. Yes, I was crying at the time and I asked him to let me go, he said, not just yet. I was trying to push him away but I was not having very much luck. I asked him to please just let me go. I told him I had had a recent miscarriage and was doctoring and would he please leave me alone. He said could he just put it in once. He said it's not going to hurt you, then I explained to him I was menstruating at the time and would he please let me alone. He said he wouldn't believe me unless I showed him, I said no and he kept on trying to pull up my skirt and said I should show him I had a pad on, I said all right and he said he would let me go.

"*Q*. During the time this conversation you have related took place, where were his hands? *A*. He had one around my shoulder and the other hand he was trying to pull up my skirt.

"*Q*. Then what happened? *A*. Then he said he would let me go.

"*Q.* Did he in fact do so? *A.* He started the car and went to go and he put the front end of the car in the ditch.

"*Q.* What happened then? *A.* He worked for a while getting the car out of the ditch, when he got it back on the road, he stopped the car and grabbed me again.

"*Q.* Would you describe again how he grabbed you at this point? *A.* He again put his arms around my shoulders just as he had before.

"*Q.* What did he do at this time? *A.* He said he was going to put it in just once, it was not going to hurt. He said it's not going to hurt you . . .

"*Q.* Was he fully clothed? *A.* Yes, he had opened his pants and taken his penis out.

"*Q.* Did you see his penis? *A.* Not until after I had pleaded with him to let me go home, I pleaded with him to let me go home, I pleaded with him to let me go and explained to him about my doctoring and would he please let me alone and then he said if you will touch it I will let you go, then I noticed it.

"*Q.* When you say touch it, to what do you refer? *A.* His penis.

"*Q.* Then what happened? *A.* I said no, I wanted to go home and would he please let me go that my children were waiting—about them being on my mind, I thought maybe if I told him about their being home he would feel sorry for me and let me go. He took hold of me and pushed my head down.

"*Q.* When you say he pushed your head down, down where? *A.* Onto his penis. . . .

"*Q.* With reference to his penis, did he force it into your mouth? *A.* He pushed my head down. I was squirming and his penis entered my mouth for a few seconds. I managed to pull away—I was squirming and trying to get away."

Oakley then drove back to his truck, got out of the car and left, after telling Mrs. ——— not to scream or holler. Mrs. ——— drove into Janesville, and from there to her home in a nearby city, arriving at her residence at about 8:30 a. m. She took a sleeping pill and went to bed for a few hours. She phoned her hometown police department at

about 3:30 p. m., and told the officer that a man had forced her off the road near Janesville, but she mentioned nothing about any assault. She testified that she did not stop and report the incident while she was in Janesville earlier in the day because she was too frightened and she did not know where the Janesville police station was located. After telephoning the police, Mrs. ———— went to Milwaukee where she remained until the following Wednesday, July 27th.

On cross-examination, Mrs. ———— testified that the whole encounter with Oakley lasted for about one hour. She testified that at no time did Oakley harm her although she "ached all over" for three days afterwards and that she was not bruised at all; that he never actually had sexual intercourse with her; that he made no effort to penetrate her; that to her knowledge she did not scratch Oakley; and that she did not attempt to sound the car horn at any time. Mrs. ———— was asked whether Oakley had threatened her with physical violence at any time, and she replied: "He didn't say he would kill me, anything like that, he made statements, I am going to put it in just once, it's not going to hurt you, things like that. As far as saying I will kill you, things like that, No." She was also asked by defense counsel about her testimony on this point at the preliminary examination:

"*Q.* Mrs. ————, in that same preliminary examination, you were asked a question, referring to this man who was in your car:

" '*Q.* He at no time had threatened to hurt you? *A.* He didn't threaten to kill me or anything like that.

" '*Q.* He didn't make any kinds of threats to you did he? *A.* I don't remember any.'

"*Q.* Do you recall those questions and answers? *A.* Yes.
"*Q.* They were correct? *A.* I believe so."

Mrs. ———— was thirty-one years old, the mother of two children, five feet, four inches tall, weighed 107 pounds, and was in good health. She has a high-school education.

Donald Oakley was five feet, 11 inches tall and weighed 180 pounds. He worked nights at the Chevrolet plant in Janesville and also operated a farm. Oakley did not testify at the trial, and the jury was instructed that his failure to take the stand does not create any presumption against him.

*Statutes Involved.*

Sec. 939.32. "ATTEMPT. . . . (2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

Sec. 944.01. "RAPE. (1) Any male who has sexual intercourse with a female he knows is not his wife, by force and against her will, may be imprisoned not more than 30 years.

"(2) In this section the phrase 'by force and against her will' means either that her utmost resistance is overcome or prevented by physical violence or that her will to resist is overcome by threats of imminent physical violence likely to cause great bodily harm."

The general attempt statute, sec. 939.32, clearly sets forth two requirements which must be met in order for conduct to be deemed a criminal attempt: (1) Intent on the part of the actor to commit the crime allegedly attempted; and (2) some acts in furtherance of this intent. These acts, in the words of the statute, must "demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

The crime of rape, as defined in sec. 944.01, Stats., is sexual intercourse with a female whom the actor knows is not his wife, where the intercourse is achieved "by force and

against her will." The statute then defines this latter phrase as meaning "either that her utmost resistance is overcome or prevented by physical violence or that her will to resist is overcome by threats of imminent physical violence likely to cause great bodily harm."

These statutory provisions lead to two conclusions as to the requirements for conviction of the crime of attempted rape: (1) The male must have the intent to act so as to have intercourse with the female by overcoming or preventing her utmost resistance by physical violence, or overcoming her will to resist by the use of threats of imminent physical violence likely to cause great bodily harm; (2) the male must act toward the commission of the rape by overt acts which demonstrate unequivocally, under all the circumstances, that he formed the intent to rape and would have committed the rape except for the intervention of another person or some other extraneous factor.

Counsel for the defense concedes that Oakley's acts were directed toward the end that he would have sexual intercourse with Mrs. ———, but contends that his conduct clearly demonstrated that he never intended to have intercourse with her "by force and against her will."

The state argues that the necessary intent was sufficiently proved, due to the fact that Oakley forced Mrs. ——— off the road and drove to a secluded area with the admitted intent to have sexual intercourse with her, and that since he did not know Mrs. ———, he had no logical reason to believe that she would willingly consent to his wishes. The state also contends that Oakley committed the requisite acts which unequivocally demonstrated his criminal intent, in that his acts were such as to thoroughly frighten a lone woman.

In *Taylor v. State* (1923), 180 Wis. 577, 583, 193 N. W. 353, this court spoke of the intent required in a case involving the crime of assault with intent to rape:

"It is necessary to show in such a case beyond a reasonable doubt that the defendant has committed an assault and that he intended to gratify his passion on the person of the woman notwithstanding any resistance on her part."

The present Criminal Code was enacted by the Wisconsin legislature in 1955, after six years of research, debate, drafting, and redrafting. Assistant Attorney General William A. Platz discussed the new code at length in an article appearing in 1956 Wisconsin Law Review, 350, 364, and reached the following conclusion as to the element of intent as contained in the section on attempts:

"All of the inchoate crimes require more than a *mere* criminal intent. . . . Attempt requires acts toward the commission of the crime which demonstrate unequivocally that the actor had the intent to and would commit the crime unless prevented."

In *Garrad v. State* (1927), 194 Wis. 391, 216 N. W. 496, the defendant was found guilty of feloniously advising the commission of a felony (sodomy) in violation of sec. 340.52, Stats. 1925. That section prescribed penalties for "any person who shall advise the commission of or attempt to commit any felony." The sodomy statute (then sec. 351.40) provided in part that the crime of sodomy "may be committed by the penetration of the mouth of any human being by the organ of any male person . . ." The defendant saw the complaining witness and a companion standing on a street corner, and invited them to ride with him in his car. They refused, and he attempted "by force and violence" to drag them across the street to his car, requesting that they allow him to have oral contact with their private parts. This court reversed the conviction, stating that under this evidence the defendant could not be convicted of the offense charged.

*State v. Hoffman* (1938), 228 Wis. 235, 280 N. W. 357, was a prosecution for rape. The defendant met the com-

plaining witness on the street, and invited her to go for a ride with him and another couple. They stopped at a tavern for a while, and then drove to a deserted area, where both couples engaged in petting and necking. The defendant put his arms around the complaining witness and kissed her several times, meeting with no objections. The other couple departed and the defendant and the complaining witness drove to another secluded spot, parked the car, and switched off the lights. He put his arms around her again and attempted to lift her skirt. She got out of the car and ran down the road. She was screaming when defendant caught up with her, and after a "tussle," she fell to the ground. Defendant helped her to her feet, and she stated that he threatened to choke her and throw her into a ditch. The defendant denied making such a threat. They came back to the car, and defendant told her that he was just going to "play around a little bit," and asked her to lift up her skirt, which she refused to do. He lifted her dress and "proceeded to carry out his purposes" over her protestations. She permitted him to rearrange her position on the seat of the car, and later called his attention to the fact that he promised not to hurt her and not to have intercourse with her. This court deemed it unnecessary to recite the details of her testimony, and reversed the conviction, holding that the evidence fell far short of proving that resistance which the law requires (pp. 244, 245):

"From the testimony of the complaining witness it appears that she was fully cognizant of everything that was going on, fully able to relate every detail thereof, and that she was in no reasonable sense dominated by that fear which excused the 'utmost resistance' within her power.

"While the evidence is well calculated to arouse keen indignation against the defendant who so persistently and importunately pursued the complaining witness, who at that time was a virgin, it falls short, in our opinion, of proving a case of rape."

It was also stated in the *Hoffman Case* that the "fear" which renders the utmost resistance unnecessary is a fear of death or great bodily harm; a fear that so overpowers her that she dares not resist. This court emphasized the fact that the defendant used no force, and that the complaining witness did not scream, fight, scratch, or kick him.

Mrs. ——— testified in the instant action that Oakley did not threaten her with physical violence at any time, and that she in fact suffered no physical harm at all—although she stated that she was "scared stiff" and afraid for her life during the encounter. There is nothing in the record to indicate that Oakley attempted to put his hand inside her blouse after she pushed it away at the very beginning of their hour-long encounter. After his first attempt at lifting her skirt, there is no testimony to indicate that he attempted to do this again. He at no time tried to get on top of her, but remained at all times seated on the seat beside her. It would appear from the facts that Mrs. ——— was successful in staving off Oakley's advances by verbal pleadings and protestations, and by pushing his hand away.

While Oakley's acts were gross, obscene, and highly reprehensible, they do not meet the statutory tests for conviction of the crime of attempted rape as set forth in secs. 939.32 and 944.01, Stats. We determine that there is no credible evidence in this record upon which the jury could have been convinced beyond a reasonable doubt that Oakley was guilty of the crime charged. The judgment of conviction, therefore, insofar as it adjudges the defendant Oakley guilty of violating secs. 939.32 and 944.01, and the order committing him to the department of public welfare under sec. 959.15, is reversed, and the plaintiff in error discharged from further custody under said conviction. There being no appeal from that portion of the judgment of conviction finding the plaintiff in error guilty of impersonating an officer in vio-

lation of sec. 946.70, that portion of the judgment is affirmed.

*By the Court.*—The judgment of conviction insofar as it finds plaintiff in error guilty of violation of secs. 939.32 and 944.01, Stats., and the order committing plaintiff in error to the department of public welfare under sec. 959.15, are reversed, and cause remanded with directions to discharge plaintiff in error from further custody under said conviction. The judgment of conviction insofar as it finds plaintiff in error guilty of violation of sec. 946.70 is affirmed.

BEILFUSS, J., took no part.

HALLOWS, J. (*dissenting*). The majority view of what constitutes the crime of attempted rape depends too much on the fact the defendant did not succeed in committing rape rather than on what he attempted. How close the defendant came to succeeding is not the test. Sec. 939.32 (2), Stats., attempted crimes, is couched in more-intelligent terms of dangerous propensities requisite to the commission of the crime rather than the concept of defining a point beyond mere preparation or dangerous proximity of success or the place in which an actor may repent and withdraw. *State v. Damms* (1960), 9 Wis. (2d) 183, 100 N. W. (2d) 592. In *Damms,* we upheld the conviction for attempted murder with an unloaded gun. It was impossible for the actor to commit the crime of murder but yet we found the necessary intent.

An attempted rape begins with the initial act on a woman, not with the act of penetration. *State v. Johnson* (1954), 243 Minn. 296, 67 N. W. (2d) 639. What is required for a crime of attempt to commit rape is the intent plus acts evincing such intent. The question of resistance by the victim is not important as it is in the crime of rape. It is admitted the defendant had the intent to have intercourse

with the prosecutrix, but the majority holds that while the defendant's acts were gross, obscene, and highly reprehensible, they only reached the stage of solicitation. I do not agree. The revolting and depraved acts went beyond the ordinary case of solicitation; that the prosecutrix was successful in dissuading the defendant is not to his credit but to hers.

The prosecutrix was a young married mother who had taken her husband to an airport on an early Sunday morning. The defendant was a total stranger to her. He stopped her car on a public highway, forced himself into the car, drove her to a secluded area, and spoke strongly of intercourse. At all times he had his hand on her and she was so forced in such a position in the car that she could not get out. Although he made no express threats of physical violence, she testified that the situation and his overpowering presence and actions frightened her and made her afraid of her life. We cannot say this was an unreasonable fright. Women minding their own business have a right to use the public highways without expecting to be molested by men roaming the highways and byways in search of sex gratification. In addition to the foregoing, the defendant exposed himself and to say the least forcefully attempted an act of sex perversion in spite of the resistance of the prosecutrix.

If the intent to commit rape and the acts toward that end, which are clearly evident here, coincide, it matters not that the defendant did not complete the act of rape which in this case would have undoubtedly resulted except for "some other extraneous factor." Such other extraneous factor need not be a policeman but can be any factor which prevented the actor from committing rape; nor need such factor be a force which prevents the actor against his will. It is sufficient that the extraneous factor causes the actor to change his mind.

The majority relies on three cases, none of which in my opinion supports its position. In *Taylor v. State* (1923),

180 Wis. 577, 193 N. W. 353, this court in upholding a conviction for assault with intent to commit rape pointed out that if there is an assault with the present intention to commit rape the defendant may be convicted of the assault with the intent although he desists before the purpose is accomplished. If the assault and the intent coincide, it is not a defense that a woman has not used the same utmost resistance required of her for a conviction of the charge of rape. The formed intention to rape may be abandoned. We believe it was in the instant facts. The case of *Garrad v. State* (1927), 194 Wis. 391, 216 N. W. 496, is clearly not in point. The majority opinion would lead one to believe the defendant in that case could not be convicted of attempted sodomy because he only "by force and violence" attempted to drag the complaining witness across the street while making a solicitation. The case did not turn on any evidence insufficient to sustain an attempt but on the fact the subject matter of the solicitation did not constitute sodomy. *State v. Hoffman* (1938), 228 Wis. 235, 280 N. W. 357, a four-to-three decision, involved the crime of rape and it is likewise not in point. *Hoffman* merely decided on the facts that the resistance of the complaining witness was insufficient to prove the crime of rape and the fear entertained by the complaining witness was not sufficient to excuse her act of submission.

The instant facts are not unlike those in *Skulhus v. State* (1915), 159 Wis. 475, 479, 150 N. W. 503, an attempted rape case, where this court stated, "Where a jury faces a situation characterized by a hostile assault having been unquestionably committed, as in this case, and, especially, by an utter stranger of intelligence and middle age, upon a young married woman, alone and in the ordinary performance of her domestic duties, they cannot be expected to draw any very fine line in respect to whether the assaulter purposed forcibly conquering and securing submission or only

of obtaining consent." In *Bishop v. State* (1916), 163 Wis. 359, 157 N. W. 1100, the defendant entered a store of which the prosecutrix was in charge just as she was locking the door and after a few words seized her and attempted to force her upon a pile of sacks of flour. The determined resistance of the woman caused him to desist and leave the store. It was argued unsuccessfully that the evidence failed to show an attempt to violate the witness and against her will.

On appeal, this court does not retry the case on the facts in the record to determine if each of its members is convinced of the defendant's guilt beyond a reasonable doubt. It is our duty to determine whether the evidence adduced, believed, and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt. *State v. Johnson* (1960), 11 Wis. (2d) 130, 104 N. W. (2d) 379; *Johns v. State* (1961), 14 Wis. (2d) 119, 109 N. W. (2d) 490. Here, the jury was correctly instructed on the crime of attempting to commit rape, the verdict had the approval of the trial court, and I cannot say that those who saw and heard the witnesses could not draw inferences from such testimony which would reasonably lead them to believe beyond a reasonable doubt the defendant was guilty of attempted rape. I must, therefore, respectfully dissent.

I am authorized to state Mr. Justice GORDON joins in this dissent.