Le Barron, Plaintiff in error, v. State, Defendant in error.

*September 9—October 7, 1966.*

For the plaintiff in error there was a brief and oral argument by *James E. Garvey* of Eau Claire.

For the defendant in error the cause was argued by *Betty R. Brown*, assistant attorney general, with whom on the brief were *Bronson C. La Follette*, attorney general, *William A. Platz*, assistant attorney general, and *Paul Leo Kelly*, district attorney of Eau Claire county.

CURRIE, C. J.  The appeal raises these two issues:

(1)  Was the evidence adduced sufficient to prove the finding of defendant guilty beyond a reasonable doubt of the crime of attempted rape?

(2)  Was trial counsel's handling of the defense of not guilty by reason of insanity and feeblemindedness such as to deny defendant a fair trial?

*Sufficiency of Evidence.*

In order to resolve the first issue it is necessary to set forth a résumé of the material facts adduced in evidence.

On March 3, 1965, at 6:55 p. m., the complaining witness, Jodean Randen, a housewife, was walking home across a fairly well-traveled railroad bridge in Eau Claire. She is a slight woman whose normal weight is 95 to 100 pounds. As she approached the opposite side of the bridge she passed a man who was walking in the opposite direction. The man turned and followed her, grabbed her arm and demanded her purse. She surrendered her purse and at the command of the man began walking away as fast as she could. Upon discovering that the purse was empty, he caught up with her again, grabbed her arm and told her that if she did not scream he would not hurt her. He then led her—willingly, she testified, so as to avoid being hurt by him—to the end of the bridge. While walking he

shoved her head down and warned her not to look up or do anything and he would not hurt her.

On the other side of the bridge along the railroad tracks there is a coal shack. As they approached the coal shack he grabbed her, put one hand over her mouth, and an arm around her shoulder and told her not to scream or he would kill her. At this time Mrs. Randen thought he had a knife in his hand. He then forced her into the shack and up against the wall. As she struggled for her breath he said, "You know what else I want," unzipped his pants and started pulling up her skirt. She finally succeeded in removing his hand from her mouth, and after reassuring him that she would not scream, told him she was pregnant and pleaded with him to desist or he would hurt her baby. He then felt of her stomach and took her over to the door of the shack, where in the better light he was able to ascertain that, under her coat, she was wearing maternity clothes. He thereafter let her alone and left after warning her not to scream or call the police, or he would kill her.

After he had left, she proceeded to a nearby restaurant, had a cup of coffee, and kept calling home by phone until she reached her husband. He came to the restaurant for her and upon reaching home he called the police to report the incident. Based on a description given by Mrs. Randen to city police, defendant was determined to be a suspect. Subsequently, he was arrested by the sheriff's department. At the police station Mrs. Randen identified the defendant as the man who accosted her.

Defendant, who was twenty-six years of age, denied being in the vicinity of the scene of the alleged attempted rape on the evening of March 3, 1965. He claimed that he was at the Wingad farm home between 6:30 and 7 p. m. on that night in the company of Janet Wingad, then seventeen years of age. However, neither Janet nor her mother were able to verify this alibi.

The material portions of the controlling statutes provide:

Sec. 944.01 (1), Stats. "Any male who has sexual intercourse with a female he knows is not his wife, by force and against her will, may be imprisoned not more than 30 years."

Sec. 939.32 (2), Stats. "An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person *or some other extraneous factor.*" (Italics supplied.)

In *Oakley v. State* [1] this court analyzed the two statutory requirements of intent and overt acts which must concur in order to have attempt to rape as follows:

"(1) The male must have the intent to act so as to have intercourse with the female by overcoming or preventing her utmost resistance by physical violence, or overcoming her will to resist by the use of threats of imminent physical violence likely to cause great bodily harm; (2) the male must act toward the commission of the rape by overt acts which demonstrate unequivocally, under all the circumstances, that he formed the intent to rape and would have committed the rape except for the intervention of another person or some other extraneous factor." [2]

The thrust of defendant's argument, that the evidence was not sufficient to convict him of the crime of attempted rape, is twofold: First, defendant desisted from his endeavor to have sexual intercourse with complainant before he had an opportunity to form an intent to accomplish such intercourse by force and against her will; and, second, the factor which caused him to desist, viz., the pregnancy of complainant, was intrinsic and not an "extraneous factor" within the meaning of sec. 939.32 (2), Stats.

It is difficult to consider the factor of intent apart from that of overt acts since the sole evidence of intent

[1] (1964), 22 Wis. (2d) 298, 125 N. W. (2d) 657.
[2] Id. at page 306.

in attempted rape cases is almost always confined to the overt acts of the accused, and intent must be inferred therefrom. In fact, the express wording of sec. 939.32 (2), Stats., recognizes that this is so.

We consider defendant's overt acts, which support a reasonable inference that he intended to have sexual intercourse with complainant by force and against her will, to be these: (1) He threatened complainant that he would kill her if she refused to cooperate with him; (2) he forced complainant into the shack and against the wall; and (3) he stated, "You know what else I want," unzipped his pants, and starting pulling up her skirt. The jury had the right to assume that defendant had the requisite physical strength and weapon (the supposed knife) to carry out the threat over any resistance of complainant.

We conclude that a jury could infer beyond a reasonable doubt from these overt acts of defendant that he intended to have sexual intercourse with defendant by force and against her will. The fact, that he desisted from his attempt to have sexual intercourse as a result of the plea of complainant that she was pregnant, would permit of the opposite inference. However, such desistance did not compel the drawing of such inference nor compel, as a matter of law, the raising of a reasonable doubt to a finding that defendant had previously intended to carry through with having intercourse by force and against complainant's will.

Defendant relies strongly on *Oakley v. State*[3] where this court held that defendant Oakley's acts were so equivocal as to prevent a finding of intent beyond a reasonable doubt to have sexual intercourse by force and against the will of the complainant. The evidence in the case disclosed neither physical violence nor threat of physical violence up to the time Oakley desisted from his attempt to have sexual intercourse with the complainant. He did put his arm around her and attempted to kiss her while entreating her to have intercourse, and also attempt-

[3] *Supra,* footnote 1.

ed to put his hand in her blouse and to lift up her skirt but did not attempt to renew this endeavor when she brushed his hand away.[4] Thus the facts in *Oakley* are readily distinguishable from those of the case at bar. To argue that the two cases are analogous because, in the one instance the accused desisted because the complainant was menstruating and in the other because of pregnancy, is an oversimplification. Such an argument overlooks the radical difference in the nature of the overt acts relied upon to prove intent.

The argument, that the pregnancy of the instant complainant which caused defendant's desistance does not qualify as an "extraneous factor" within the meaning of sec. 939.32, Stats., is in conflict with our holding in *State v. Damms*.[5] There we upheld a conviction of attempt to commit murder where the accused pulled the trigger of an unloaded pistol intending to kill his estranged wife thinking the pistol was loaded. It was held that the impossibility of accomplishment due to the gun being unloaded fell within the statutory words, "except for the intervention of . . . some other extraneous factor."[6] Particularly significant is this statement in the opinion:

"An unequivocal act accompanied by intent should be sufficient to constitute a criminal attempt. In so far as the actor knows, he has done everything necessary to insure the commission of the crime intended, and he should not escape punishment because of the fortuitous circumstance that by reason of some fact unknown to him it was impossible to effectuate the intended result."[7]

---

[4] After Oakley desisted from his attempt to persuade complainant to have sexual intercourse he did engage in gross misconduct which well might have supported a conviction of attempt to commit sodomy, but he was not charged with that offense. It was this latter conduct which the court also had in mind when it characterized his total acts as "gross, obscene, and highly reprehensible." *Oakley v. State, supra,* at page 309.

[5] (1960), 9 Wis. (2d) 183, 100 N. W. (2d) 592.

[6] Id. at page 187.

[7] Id. at page 191.

The unloaded condition of the gun was every bit as much a part of the intrinsic fact situation in the *Damms Case* as was complainant's pregnancy in the instant case. We determine that such pregnancy constituted the intervention of an "extraneous factor" within the meaning of sec. 939.32 (2), Stats.

### *Alleged Denial of a Fair Trial Due to Acts of Trial Counsel.*

On the issue of identity the police showed complainant only two men from whom to identify her assailant—defendant and a detective whom she knew. Complainant testified she did not think she could have identified defendant if he had dressed differently. Janet Wingad and her mother did not flatly deny that defendant was at their home at the time of the attempted rape, but stated that they could not recall the facts well enough to enable them to testify one way or the other on this point.

On the basis of these facts defendant contends that the issue of whether defendant was the assailant of complainant was close. Proceeding on this hypothesis defendant argues that his trial counsel committed a serious blunder in introducing into evidence defendant's long prior criminal record and misdeeds as a child which may well have tipped the scales in causing the jury to conclude that defendant was the man who committed the acts testified to by complainant.

Defendant took the stand in his own defense and trial counsel by his questioning brought out these facts: When defendant was nine years old he set fire to a furniture factory in Eau Claire and another one at some stables in which a Percheron horse perished in the blaze. As a result defendant was sent to Mendota State Hospital in September, 1948. The next year, when ten years old, he was transferred to Southern Colony at Union Grove. In September, 1954, he was taken to the Wisconsin Diagnostic Center and given tests, and in October, 1954, was

returned to Southern Colony from which he later ran away. He was taken back to that institution and in October, 1955, was transferred to Central State Hospital at Waupun. At age sixteen defendant was released from Central State Hospital and went to live in a foster home in Milwaukee. He was unhappy there and in two weeks returned to Central State Hospital. After a short time he was placed in a foster home in Madison where he stayed six months. He then broke into the Historical Society Museum and stole some guns and was taken back to Central State Hospital. On November 27, 1961, he was discharged from there. Defendant went to Madison, obtained employment, married and then was discharged from his employment because of his prior bad record, and went on welfare relief. While on relief he broke into an apartment and stole some money and also struck a lady on the street and took her purse. This resulted in his being placed in Mendota State Hospital, but eventually he was placed on probation. His probation was revoked for misconduct and he was sentenced to two years in Green Bay Reformatory. He was released on October 22, 1963, and went to Eau Claire. There he stole some pigeons and was again sentenced to the reformatory for six months. After his release he stole some money from a woman in a car in Eau Claire and pleaded guilty to that charge, but the record is silent as to the sentence imposed.

Defendant now criticizes trial counsel for persisting in the insanity and feebleminded defense and introducing the foregoing prejudicial evidence in the record in furtherance of that defense in face of the overwhelming evidence that defendant was sane and not feebleminded. The trial court had appointed two psychiatrists to examine defendant before trial and they testified defendant was neither insane nor feebleminded. Defendant testified he considered himself sane.

The record reveals that defendant's trial counsel undertook conscientious cross-examination of the state's witnesses and especially of the complainant. In fact, counsel

on appeal relies heavily on the testimony that trial counsel elicited from the complainant on cross-examination. The crux of the complaint, though, is that trial counsel's decision to plead defendant not guilty by reason of insanity, and to adduce testimony as to his long career in state hospitals and prisons in support thereof, was entirely without logic and had absolutely no redeeming merit. As noted in *Pulaski v. State*,[8] "Often after trial, charges of incompetency are directed toward counsel because it appears other tactics than those chosen might have been more helpful to the accused." [9] This seems to be just such an objection to a tactic, and, even assuming that defendant's present view of tactics is the correct one, it would not seem, in light of the trial counsel's total performance, to satisfy the test of inadequacy, that this court has laid down, viz., "Unless the representation of counsel is so inadequate and of such low competency as to amount to no representation, a new trial cannot be granted on that ground." [10]

Furthermore, there would seem to be arguable merit in the trial counsel's tactic. His client had been positively identified by a complaining witness whose physical condition made her a highly sympathetic figure; his alibi witnesses had refused to verify his alibi; and he had a long record of mental disturbance and causally related violence. Under these circumstances, trial counsel might have found himself criticized by later appellate counsel if he had not done everything in his power to get an insanity acquittal.

*By the Court.*—Judgment and order affirmed.

GORDON, J. (*concurring*). I concur with the court's holding. I also join in the court's opinion except insofar as it attempts to distinguish *Oakley v. State* (1964), 22

---

[8] (1964), 23 Wis. (2d) 138, 126 N. W. (2d) 625.

[9] Id. at page 148.

[10] Id. at page 148. See also *State v. Cathey*, ante, p. 79, 145 N. W. (2d) 100.

Wis. (2d) 298, 125 N. W. (2d) 657. Both in that case and in the case at bar there were aggressive and offensive acts which unmistakably evidenced an intent to rape—or, at the very least, acts which a jury was entitled to find showed such intent.

In *Oakley,* this court labeled the defendant's conduct as "gross, obscene, and highly reprehensible." (p. 309.) I am unable to accept the majority's effort to treat Mr. Oakley's atrocious actions as distinguishable from those of Mr. Le Barron. By trick, Mr. Oakley succeeded in entering the auto of a total stranger and drove her to a secluded place. Against her wishes and in spite of her tears he detained her for an hour. The prosecutrix, who weighed a mere 107 pounds, testified at the trial in that case that she was unable to get out of the car; however, she resisted him in all his advances. Mr. Oakley persisted in his demand for sexual intercourse with her even *after* he physically verified her assertion that she was menstruating at the time. He exposed his penis. His other nefarious conduct is fully outlined at pages 301–303 of this court's decision.

The majority opinion in the case at bar points out that Mr. Oakley finally desisted from his attempt to have sexual intercourse with his victim. His ultimate failure "to renew this endeavor" cannot properly be construed to relieve him of the onus of his prior criminal conduct, nor should it now be utilized by the court to distinguish his intentions from those of Mr. Le Barron's; as Mr. Justice HALLOWS well stated in a dissent to the *Oakley Case,* at page 311:

"[T]hat the prosecutrix was successful in dissuading the defendant is not to his credit but to hers."

In my view, the instant case only serves to demonstrate rather dramatically how erroneous was the holding in *Oakley.*

I am authorized to state that Mr. Justice HALLOWS joins in this concurring opinion.