NELSON, Plaintiff in error, v. STATE, Defendant in error.

*June 9—June 30, 1967.*

798

802

For the plaintiff in error there was a brief and oral argument by *Robert H. Friebert,* public defender.

For the defendant in error the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general, and *William A. Platz,* assistant attorney general.

CURRIE, C. J.   We are here confronted with the following issues:

(1)  Was the defendant denied the effective assistance of counsel?

(2)  Did a conflict of interest exist because defendant's counsel was a candidate for the office of district attorney?

(3)  Should defendant's sentence be adjusted because his accomplice received a lesser sentence?

*Alleged Denial of Effective*
*Assistance of Counsel.*

In order to consider in proper perspective defendant's claim of ineffective assistance of counsel, we deem it advisable to set forth the following facts.

There is no question but that defendant and John Soulier robbed Martin Morrison, the operator of Marty's Tavern, December 10, 1963. Defendant, after being apprehended with Soulier in a stolen car which contained bottles of liquor taken during the robbery, confessed his guilt to the police. At trial, he and Soulier were identified as the men who entered Marty's Tavern shortly after midnight December 10, 1963. Soulier himself testified that he and defendant robbed Morrison. Defendant testified that he remembered being in the tavern, but claimed he "blacked out" after entering the tavern and did not "come to" until he awoke in the Oneida county jail. The state's evidence clearly established defendant had not "blacked out." This was established not only by the testimony of Soulier as to defendant's statements and actions immediately prior to, during, and after the robbery, but was clearly demonstrated by defendant's oral statements to Officer Paris of the Rhinelander police force and by his written confession in which he, in detail, described the robbery and his subsequent activities.

The defense of insanity was not only disproved by the foregoing evidence, but, in addition, two disinterested medical experts appointed by the court testified that in their opinion defendant was legally sane.

In an attempt to meet the burden of proving ineffective assistance of counsel defendant has specified several claimed "major areas of faulty representation" which are hereinafter discussed seriatim.

(a) *Failure to object to hearsay and opinion evidence.*
William Schilling was called as a witness for the state. He testified that Messrs. Cobourn, Pecore, and himself were in the Morrison tavern the night of December 9, 1963, when defendant and Soulier entered the establishment. The following question was asked Schilling by the district attorney and this answer given:

"Q. Could you describe generally the other man that was with Mr. Nelson? A. Well, as I said, they were dressed in heavy clothing, they were both big men, and I can recall a big shock of blond hair and to be truthful with you we talked about it, Mr. Pecore, Mr. Cobourn and I, we discussed it at the bar that they were rather tough looking characters, that is my description of them. In fact, we were all three a little apprehensive. We had discussed it among ourselves at the time they walked in."

Mr. Dennin, defendant's counsel, neither objected to nor interposed a motion to strike the above-quoted answer. Defendant contends the answer constituted prejudicial hearsay and opinion evidence. We fail to see how the answer was prejudicial inasmuch as both defendant and Soulier were present in court where the jury could determine for themselves whether they were "tough looking." In fact, if they were not "tough looking," such characterization by Schilling could have reflected unfavorably against him as a witness.

Dennin, in cross-examining Schilling asked why he described defendant and Soulier as "tough looking." Schilling replied that he and Pecore discussed the appearance of defendant and Nelson on the way home, and that he had a feeling of "intuition" or "apprehension" as he and Pecore left Marty's Tavern. At most this was a harmless error of judgment on Dennin's part in conducting his cross-examination of Schilling.

Soulier upon direct examination as a witness for the state testified:

". . . All I could hear was the bartender pleading, telling him that was enough, to stop. I don't know—as I learned later I can only tell you that, he was kicked, and I couldn't tell you how many times but that is what went on. I believe he said he hit the man in the ribs, the rib cage above the kidneys, near the kidneys, and then proceeded to stomp him, and that is when we both packed up the bags and went out the door."

Defendant contends Dennin should have objected to, and secured the exclusion of, Soulier's testimony with respect to defendant's kicking, hitting, and stomping on Morrison, because the occurrence was without Soulier's personal knowledge. However, the above-quoted testimony with respect to the mistreatment of Morrison makes it clear Soulier was only relating what defendant told him. While Soulier's testimony was in part hearsay it was not subject to legitimate objection because it constituted an admission against interest on the part of defendant.

(b) *Evidence of other crimes.*

Soulier also testified that he and defendant, who had been fellow prisoners at the state prison at Waupun, on the afternoon of December 9, 1963, at Green Bay, drank beer and played cribbage. Around 4 p. m. they began talking about "illegal matters," like "where money could be obtained and how and where." After dark they stole an automobile in Green Bay and traveled north. They made stops for lunch and beer and checked a map for the nearest large town which proved to be Rhinelander. Defendant (in referring to Rhinelander) said, "This is the place we are going to hit." They chose Marty's Tavern at random and there robbed and beat Morrison. Thereafter they drove to Wabeno where they burglarized an electrical store. After leaving Wabeno, which was then December 10th, they were chased by police several times and were finally apprehended the same day in Shawano county.

Defendant claims Mr. Dennin was remiss in not objecting to evidence of other crimes, *i.e.*, the stealing of the car and the burglarizing of the electrical store in Wabeno. In *Herde v. State* [1] this court held evidence of acts committed within a few hours of a crime which

[1] (1941), 236 Wis. 408, 410, 295 N. W. 684.

were similar in nature and closely connected admissible to show the defendant's "attitude of mind." It also said:

"While as a general rule a person charged with a particular offense has a right which should not be trespassed upon to have the evidence in support of such charge confined to that particular offense, there is an exception which permits the state to offer proof of other offenses *so intimately connected with the one for which the defendant is on trial* as to be evidentiary of *intent,* design, or motive. 1 Wharton, Criminal Evidence (11th ed.), p. 516, sec. 350 *et seq.* . . . . The criminality of conduct is no reason for excluding evidence of that conduct when it is relevant and admissible." [2]  (Emphasis supplied.)

Here defendant not only sought to escape responsibility for the robbery at Marty's Tavern on the ground that he had blacked out, but also claimed that, if he did commit the robbery, he was insane at the time. Thus his "attitude of mind," or mental condition was a critical factor in his defense.

Not only was the evidence of other crimes admissible and therefore not subject to legitimate objection, but the defense strategy of supporting a plea of not guilty by reason of insanity with proof of other crimes has been recognized as a meritorious tactic. In *Le Barron v. State* [3] wherein this court considered a claim of ineffective assistance of counsel, defendant claimed his trial counsel committed a "serious blunder" by introducing into evidence testimony of defendant's misdeeds

---

[2] Id. at page 410. See also 29 Am. Jur. (2d), Evidence, pp. 402–404, sec. 353. McCormick, Evidence (hornbook series), p. 328, sec. 157, states that evidence of other crimes is admissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." In *Griffin v. State* (Fla. App. 1960), 124 So. (2d) 38, the Florida district court of appeals inverted the traditional exclusionary rule relating to the admissibility of other crimes holding that such evidence was admissible except where it was introduced as evidence of character.

[3] (1966), 32 Wis. (2d) 294, 301–303, 145 N. W. (2d) 79.

as a child, his prior criminal record, and testimony of his long career in state hospitals and prisons. It was held that such strategy did not evince inadequacy of counsel and that counsel could have been legitimately criticized by appellate counsel if he had not pursued the tactic in question in an attempt to "get an insanity acquittal."

(c) *No objection to receipt in evidence of defendant's oral and written statements.*

On December 12, 1963, two days after his arrest, defendant orally admitted his guilt to the police and shortly thereafter reduced his confession to writing. On that same day he was brought before Judge RICHARDS.

It is now claimed *inter alia* that the statements were taken during a period of unreasonable delay between the arrest and defendant's appearance before the magistrate and that defense counsel should have challenged the admissibility of defendant's oral admission of guilt and his written confession on that basis. In *Phillips v. State* [4] this court said that detention for a period longer than is reasonably necessary for the purpose of limited interrogation violates due process and renders inadmissible any confession obtained during such unreasonable period of detention. In *State v. Carter* [5] it was held that *Phillips* was to be accorded prospective effect only. Since defendant's trial antedated *Phillips* by approximately sixteen months it would indeed be unreasonable to hold the failure to raise the point of unreasonable delay as bearing on the admissibility of defendant's oral statement and written confession demonstrated in any respect ineffectiveness of counsel. To so hold would be to charge defense counsel with a lack of clairvoyance.

Defendant himself testified he had talked to Officer Paris, and signed the confession which consisted of in-

[4] (1966), 29 Wis. (2d) 521, 534, 535, 139 N. W. (2d) 41.
[5] (1966), 33 Wis. (2d) 80, 97, 146 N. W. (2d) 466.

formation defendant had previously supplied to Paris. Defendant made no claim that his oral statements or written confession was the result of any force, threats or promises. Thus, eliminating the point of being held in custody for an unreasonable period before being taken before a magistrate, there existed no basis for Mr. Dennin to have attacked the voluntariness of the oral statements and written confession.

Defendant realized the oral statements and written confession were inconsistent with his testimony that he had "blacked out," and did not recall any events of the robbery. Therefore, to explain this inconsistency he testified that the details of the robbery given by him in the oral statements and written confession had been learned by him prior to arrest by listening to the police radio.

Defendant now criticizes Mr. Dennin for having made no effort to determine whether it was possible for defendant to have learned the details of the robbery from overhearing the police radio. Inasmuch as the state introduced no evidence to disprove defendant's testimony with respect to what he overheard on the police radio, we cannot perceive any good reason why Mr. Dennin should have pursued the subject further.

(d) *Failure to request an instruction on effect of a finding of not guilty by reason of insanity.*

Soulier testified that defendant had said to him:

"They could never convict me because I have this on my record. I have been incarcerated in the nut house. All I had to do is play hanky-panky with the head shrinkers and in a few months I'll be free."

It is contended that this statement gave the jury the wrong impression of the effect of a verdict of not guilty by reason of insanity, and that Mr. Dennin should have requested an instruction which would have correctly informed the jury of the effect of such a verdict.

In *State v. Shoffner* [6] this court held it is proper to instruct the jury that a finding of not guilty by reason of insanity will not free the defendant but will subject him to hospitalization as required by sec. 957.11 (3) and (4), Stats. [7] However, this court further held in *Shoffner* that, while it preferred the giving of such instruction, it was not prejudicial error not to give it.

The misleading feature of the aforequoted statement, which Soulier testified defendant made, is the inference that, if defendant were found not guilty by reason of insanity, the psychiatrists at the mental institution to which defendant would be confined had the authority to release defendant in a few months. This is not the case as sec. 957.11 (4), Stats., requires a hearing on the sanity of the committed defendant before the committing court before he can be found sane and released. Nevertheless the psychiatric testimony at such a hearing is likely in most cases to be controlling.

However, as we pointed out in *Shoffner,* the giving of the instruction approved therein is inconsistent with the ordinary rule that a jury is not to be informed of the effect of its answers upon the rights or liabilities of the parties. In view of this widely known general rule, and the fact that the instant case was tried before the briefs in *Shoffner* were filed in our court, we do not feel

[6] (1966), 31 Wis. (2d) 412, 428, 429, 143 N. W. (2d) 458.

[7] The requested instruction approved by this court in *Shoffner* read as follows: ". . . if you find the defendant not guilty by reason of insanity, he will not be released. If he is found to be not guilty by reason of insanity, he will be committed by this Court to the central state hospital or to some other institution designated by the State Department of Public Welfare and will be detained there until this Court in an appropriate mental examination shall determine that the defendant is sane and mentally responsible and further shall find that he is not likely to have a recurrence of insanity or mental irresponsibility such as would result in criminal acts."

any just criticism can be leveled at Mr. Dennin for not having requested the instruction.

(e) *Propriety of cross-examination of defendant by district attorney.*

On direct examination defendant testified he had on various occasions been admitted to mental institutions. Among those mentioned was Newberry State Hospital in Michigan where defendant had been sent by a court for observation after he had been charged with attempted rape.

The district attorney devoted approximately one third of his cross-examination to the Michigan incident. During the course of the examination he intimated that defendant feigned insanity by asking whether he "played a program" at that institution. The question was asked twice. On neither occasion however did Mr. Dennin object.

This court has indicated its disapproval of resorting to tactics based on an unproved accusation either by statement or insinuation. What was said in *Sullivan v. Collins* [8] is apposite here:

"When counsel . . . throws into the case such charges and insinuations, with the added weight of his own character and prestige, he does that which no lawyer should do. He tries his case upon unsworn statements and vilification, instead of evidence, and he obtains a verdict, if at all, based, in part at least, upon that which is not evidence, and which has no proper place in the trial." [9]

While the questions asked by the district attorney, which are now objected to by defendant, may have been "logically relevant" in view of the fact that defendant pled *not guilty by reason of insanity,* it is difficult to

[8] (1900), 107 Wis. 291, 298, 83 N. W. 310.

[9] See 4 Jones, Evidence (5th ed.), p. 1746 *et seq.*, sec. 930, which cites *Sullivan v. Collins, supra,* fn. 8, with respect to limitations on the right of cross-examination. See also *Sutton v. Chicago, St. P., M. & O. R. Co.* (1898), 98 Wis. 157, 163, 73 N. W. 993.

imagine their relevancy was not outweighed by the prejudice they were calculated to evoke in the minds of the jurors. The questions should have been objected to by defense counsel.

   (f)   *Consent to appointment by court of general medical practitioners instead of psychiatrists to examine defendant with respect to his sanity.*

The record indicates there was considerable discussion between Judge BOILEAU, Mr. Dennin and the district attorney relating to the question of who should be appointed by the court as experts to testify as to defendant's mental condition at the time he committed the alleged offense. There being no psychiatrists in Oneida county, it was agreed by the district attorney and Mr. Dennin that defendant be examined by Drs. Simmons and Osborne who had been appointed previously to examine defendant regarding his mental capacity to stand trial. Judge BOILEAU stated:

"There being no objection, the court will appoint Dr. Simmons and Dr. Osborne under the provisions of sec. 957.27. . . . The court is of the opinion that they are qualified experts and there being no persons who specifically practice exclusively in the field of psychiatry in this area, the court is of the opinion that they are competent to make this examination and will accordingly, by the stipulation of the parties, be appointed as expert witnesses under the provisions of sec. 957.27."

At one point the judge suggested defendant be examined by Dr. Schubert, a psychiatrist who is superintendent of Central State Hospital. Mr. Dennin understandably objected to the suggested appointment because of the content of Dr. Schubert's report to the court dated June 1, 1964, wherein it was stated that despite three previous hospitalizations defendant had never been diagnosed as psychotic but was an "extremely inadequate individual" who in the past adjusted better to hospital than prison life.

Whether sec. 957.27 (1), Stats., requires psychiatrists only to testify where the defense is insanity does not appear to have ever been squarely determined in Wisconsin.

In *Cullen v. State*[10] this court held physicians are qualified to determine the competency of an accused to stand trial. In that case it was urged that the court should have appointed a psychiatrist instead of a general practitioner. It was also contended that the doctors' medical examination was brief and that they did not delve into the correct tests and criteria for determining sanity. In reply this court said:

"Counsel has presented no authority to support his claim that the physician appointed must be a psychiatrist. We do not regard sec. 51.01 (2), Stats., as controlling in the instant case. In our opinion, the appointment of a physician engaged in general practice was lawful under sec. 957.13 (1), which authorizes the trial court to conduct a summary inquiry. We believe that, from a reading of the aforesaid section of the statutes, *and the alternative section, sec. 957.27 (3)*, it is apparent that the legislature intended to impose broad discretion upon the trial judge in determining mental capacity to stand trial." (Emphasis supplied.)

The language of sec. 957.27 (1), Stats., suggests the judge also has broad discretion to determine when experts should be appointed as witnesses and who are "disinterested qualified experts." Sub. (1) in relevant part provides:

"Whenever, in any criminal case, expert opinion evidence becomes necessary or desirable the judge of the trial court *may* . . . appoint one or more disinterested qualified experts, . . ." (Italics supplied.)

Sec. 51.01 (2), Stats., referred to in *Cullen, supra,* and relied upon in part by defendant does not by analogy or

[10] (1965), 26 Wis. (2d) 652, 133 N. W. (2d) 284, certiorari denied, 382 U. S. 863, 86 Sup. Ct. 126, 15 L. Ed. (2d) 101.

otherwise support the proposition that psychiatrists only are competent to conduct a mental examination. Sec. 51.01 (2) in relevant part provides:

"APPOINTMENT OF EXAMINING PHYSICIANS. (a) On receipt of the application the court shall appoint 2 duly licensed reputable *physicians* to personally examine the patient, one of whom, *if available, shall be a physician with special training in psychiatry, . . .*" (Italics supplied.)

What appears to be the general rule is stated in 23 C. J. S., Criminal Law, p. 425, sec. 867:

"Ordinarily, a regular practicing physician, at least if he has made some study of the subject of insanity, or has had some experience with mental cases, is deemed qualified as an expert; it is not necessary that he be an alienist or a specialist in mental diseases, and the fact that he does not claim to be an expert is not controlling where the evidence otherwise shows him to be qualified." [11]

Defendant directs this court's attention to a number of cases which he contends support the proposition that when the defense of insanity is raised an accused is entitled to a mental examination by a psychiatrist. Neither *Smith v. Baldi* [12] nor *Bishop v. United States* [13] so hold; nor does *Thomas v. Cunningham.* [14]

---

[11] See also 21 Am. Jur. (2d), Criminal Law, p. 131, sec. 48.

[12] (1953), 344 U. S. 561, 73 Sup. Ct. 391, 97 L. Ed. 549.

[13] (D. C. Cir. 1955), 223 Fed. (2d) 582, rev'd (1956), 350 U. S. 961, 76 Sup. Ct. 440, 100 L. Ed. 835. Defendant relies on Circuit Judge BAZELON'S dissenting opinion in 223 Fed. (2d) at page 592. The majority opinion at page 586 drew the inference "that Bishop's mental difficulty might well have been a prison psychosis caused by the shadow of the sentence" and "fails to indicate incompetence at time of trial." Judge BAZELON in his lone dissent stated: "There is serious doubt that any judge—trial or appellate—should draw such inferences from such evidence, without the assistance of expert psychiatric opinion. But even if

It is true, as defendant points out, that in most of the relatively recent cases involving the defense of insanity which have reached this court, the mental examinations have been conducted by psychiatrists.[15] However, at present, while it may be desirable [16] to appoint psychiatrists only to conduct mental examinations when the defense of insanity is raised, neither our statutes nor constitutional guarantees of due process and equal protection of the law require that this be done.

In the instant case, Dr. Simmons, one of the two court-appointed physicians, is a 1958 graduate of the University of Michigan medical school and has been practicing medicine ever since. His specialty is internal medicine. However, he has also treated patients for mental disorders. Further, while serving as an army medical officer, he was in charge of a psychiatric unit, a 350-bed hospital, for about a year. He has examined hundreds of persons suspected of being mentally ill or feeble-minded and has frequently been appointed by the courts to examine persons suspected of suffering from mental disease and mental disorder.

The exact qualifications of Dr. Osborne are not set forth in the record because they were apparently well known by the defense, the district attorney, and the court.

We conclude that Mr. Dennin's stipulation to the appointment of Drs. Simmons and Osborne does not

such inferences can be drawn without such assistance, it seems clear to me that they should not be drawn in the first instance by appellate judges."

[14] (4th Cir. 1963), 313 Fed. (2d) 934.

[15] See e. g., State v. Shoffner (1966), 31 Wis. (2d) 412, 143 N. W. (2d) 458; State v. Esser (1962), 16 Wis. (2d) 567, 115 N. W. (2d) 505; State v. Carlson (1958), 5 Wis. (2d) 595, 93 N. W. (2d) 354.

[16] See Roberts, Some Observations on The Problems of the Forensic Psychiatrist, 1965 Wisconsin Law Review, 240, for an excellent discussion of the problems facing a psychiatrist in examining an accused when insanity is raised as a defense.

constitute a basis for the claim that defendant was denied the effective assistance of counsel.

(g) *In summary.*

Courts are almost universally in agreement that an assertion of ineffective assistance of counsel will prevail only where trial representation was so inadequate as to amount to no counsel at all and the trial was reduced to a sham and a mockery of justice.[17] The incidents relied upon by defendant to establish inadequacy of counsel fall far short of meeting this test. We are satisfied Mr. Dennin acted competently. The one respect in which there was a tactical lapse by him was in failing to object to questions put to defendant by the district attorney upon cross-examination which accused defendant of feigning insanity in Michigan. A single incident of this nature is an insufficient ground upon which to predicate a holding of ineffective assistance of counsel.

## Conflict of Interest.

Defendant's brief alleges a conflict of interest arose because of Mr. Dennin's candidacy for the office of district attorney at the time he represented defendant in the trial court and charges:

"Mr. Dennin may have thought that a vigorous defense with exact cross-examination would have interfered with his personal political ambitions."

At the outset it should be noted that defendant requested Mr. Dennin be appointed to represent him in the proceedings before the magistrate. Nowhere is it established or claimed that defendant was unaware of Mr. Dennin's candidacy for the office of district attorney.

---

[17] *State v. Cathey* (1966), 32 Wis. (2d) 79, 86, 87, 145 N. W. (2d) 100. See also *Rivera v. United States* (9th Cir. 1963), 318 Fed. (2d) 606, 608; *Eskra v. State* (1965), 29 Wis. (2d) 212, 223, 138 N. W. (2d) 173; *Pulaski v. State* (1964), 23 Wis. (2d) 138, 148, 126 N. W. (2d) 625.

Further, after being convicted, defendant in a letter to the clerk of this court asked whether it was possible for his trial attorney, who was then district attorney, to represent him on appeal.

No decisions have been cited which support the claim that a conflict of interest arises where the defense attorney is a candidate for election to the office of district attorney. In *Goodson v. Peyton* [18] the Fourth circuit court of appeals recognized that possibilities of conflicts in interest were inherent where a district attorney undertook the role of defense counsel in an adjoining county. As defense counsel, the court noted, the district attorney might find himself required to attack laws, interpretations, practices and conduct which as district attorney he was bound to defend in the county in which he held office. Thus the court prospectively ruled it would presume that one involuntarily represented by a public prosecutor in a criminal trial had not had the fair trial to which he is constitutionally entitled. *Goodson* is distinguishable from the case at bar by the fact that defense counsel therein had already assumed the duties and responsibilities of district attorney. Defense counsel in the case at bar was merely a candidate seeking that office. There is no "inherent conflict of interest" in the latter situation.

The same distinction can be drawn regarding Opinion 73 of the Michigan State Bar Committee on Professional Ethics [19] which states that an attorney who defended a client found guilty of murder, upon election as prosecuting attorney, should withdraw from the case on appeal.

Of note are the following decisions. In *State v. Sowards* [20] defendant contended he was prejudiced by

[18] (4th Cir. 1965), 351 Fed. (2d) 905. Contra, *Yates v. Peyton* (1966), 207 Va. 91, 147 S. E. (2d) 767.

[19] See 38 Michigan State Bar Journal (No. 5, 1959), at page 96.

[20] (1965), 99 Ariz. 22, 406 Pac. (2d) 202.

having been represented at trial by counsel who, during the course of trial and prior thereto, was seeking appointment to the position of civil deputy in the office of the county attorney which office prosecuted the action against defendant. Defendant asserted the situation created a conflict of interest, or a potential conflict of interest. The Arizona supreme court found no conflict of interest, stating:

"We recognize, under some circumstances, this possible conflict of interest could deprive an accused of a fair trial. However, as we said in *State v. Garaygordobil*, 89 Ariz. 161, 359 P. 2d 753 (1961), '[t]he mere possibility of a future conflict of interest developing by an attorney representing different interests is not sufficient to disqualify him.' A fair trial, as well as the ethics of the profession, could, under some circumstances, demand a case be reversed where such a conflict of interest is shown. The present case, however, does not require such a disposition." [21]

In *People v. Brewer* [22] a police commissioner from a community other than the one where the alleged crime had been committed was appointed to defend an accused indicted for the crime of murder in the first degree. The court held the situation did not give rise to a conflict of interest.

Defendant contends that a conflict of interest arose when Judge BOILEAU, in the extended discussion with counsel concerning the appointment of physicians to examine defendant as to his sanity, stressed the great cost to Oneida county if psychiatrists from outside the county were to be appointed. It is argued that this resulted in Mr. Dennin agreeing to have Drs. Simmons and Osborne appointed because he thought his candidacy for district attorney would be injured if he put the county to the expense of insisting that the court appoint psychiatrists living without the county.

[21] Id. at page 30.
[22] (1963), 39 Misc. (2d) 1026, 242 N. Y. Supp. (2d) 303.

This argument is based on surmise and speculation. At least an equally reasonable hypothesis would be that Mr. Dennin was motivated throughout his representation of defendant by the desire to win defendant's case and establish himself in the eyes of the electors as a better lawyer than the incumbent district attorney who was Mr. Dennin's opponent in the coming election. Moreover, we must assume in the absence of proof to the contrary that Mr. Dennin was an ethical lawyer who would not permit any interest personal to himself to interfere with his duty to give unswerving loyalty to the interests of defendant.

We hold there was no conflict of interest in Mr. Dennin representing defendant while a candidate for the office of district attorney.

### Defendant's Sentence.

Defendant complains there was an inequality of sentence between the ten-year indeterminate sentence he received and the five and a half year sentence meted out to Soulier. There is nothing in the record before us covering what transpired at the time sentence was imposed on Soulier. However, for the purpose of disposing of defendant's contention we will assume the correctness of defendant's hearsay statement that Soulier's sentence was five and a half years.

It is suggested that the more severe sentence was imposed on defendant because he failed to plead guilty as did Soulier, but exercised his right to insist on a trial.

In *State v. Tuttle* [23] this court recognized it had the appellate power to review a lawfully imposed sentence. The recognition of such power was however tempered by the language that its exercise would be governed by a strong policy against interference with the discretion

[23] (1963), 21 Wis. (2d) 147, 124 N. W. (2d) 9.

of the trial court. Recently in *Jung v. State* [24] it was held the mere fact that an accused who pleaded not guilty and received a substantially greater sentence than an accomplice who pleaded guilty and testified for the state did not establish grounds for relief nor did it constitute a violation of due process or equal protection of the laws guaranteed by the constitution.

In the case at bar it does not appear the trial court based its determination of defendant's sentence upon factors not proper or irrelevant to sentencing, or was influenced by motives inconsistent with impartiality.[25] In pronouncing sentence on defendant Judge BOILEAU stated:

"You have a long record becoming involved with the law on very serious offenses, . . . The court can find no excuse to be lenient in this matter. The court does find that you are a repeater under the provisions of sec. 939.62. However, the court is of the opinion that the maximum sentence provided for this offense without additional penalty for being a repeater is appropriate and proper in this case."

This statement gives sound reasons for imposing the ten-year sentence on defendant. Inasmuch as we do not have the benefit of what transpired when Soulier was sentenced we can only surmise why he received a lighter sentence. One surmise is that the court might well have concluded that defendant's rehabilitation required a greater length of sentence than did Soulier's.

*By the Court.*—Judgment affirmed.

---

[24] (1966), 32 Wis. (2d) 541, 145 N. W. (2d) 684. For a discussion relating to the appellate review of sentences see, Standards Relating to Appellate Review of Sentences (tentative draft 1967), by the Adversary Committee of the American Bar Association's Committee on Minimum Standards for Criminal Justice. The draft at pages 158–160 contains an exhaustive bibliography of articles discussing generally the problems of sentencing and review.

[25] Id. at page 548.