Shirley Marie CURRY *v.*
STATE of Arkansas

CR 80-119                  611 S.W. 2d 745
Supreme Court of Arkansas
Opinion delivered February 16, 1981

*E. Alvin Schay*, State Appellate Defender, by: *Ray Harten-stein*, Chief Deputy Appellate Defender, for appellant.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. On the night of June 19, 1974, the appellant, Shirley Marie Curry, in four successive

incidents shot and killed five persons and wounded a sixth. She was charged with capital felony murder in the second incident, in which she killed her former husband, Jimmy Lee Curry, and their daughter Sabrina, aged 17. The case was inactive for about four years because Mrs. Curry was committed to the State Hospital and found to be mentally ill to the degree of legal irresponsibility.

In July, 1978, the doctors reported that Mrs. Curry had recovered from her psychotic illness, had been in remission for over a year, and was able to understand the proceedings and to assist effectively in her own defense. They were still of the opinion that at the time of the offenses Mrs. Curry had probably been suffering from a mental disease or defect to such a degree as to make her unable to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law. They expected Mrs. Curry to remain in remission from her illness as long as she continued medication.

Upon resumption of the proceedings Mrs. Curry pleaded not guilty by reason of insanity. The first trial resulted in a hung jury. At the second trial the jury found Mrs. Curry guilty and sentenced her to life imprisonment without parole. The principal issue on appeal is whether there is substantial evidence to support the jury's conclusion that Mrs. Curry was not insane at the time she committed the two murders in question.

There is actually very little dispute in the testimony, the difficulties lying in the inferences to be drawn.

Mrs. Curry was awarded custody of the couple's three children when she obtained a divorce in 1967, but her husband insisted upon a provision that the children be allowed, as each one reached 14, to choose the parent they wanted to live with. In 1971 Sabrina, the oldest child, chose to live with her father. June Cook, a frequent visitor to Mrs. Curry's home after that, was surprised at the extent of Mrs. Curry's hostility toward her former husband as much as six years after the divorce. The witness was also impressed by Mrs. Curry's bitterness toward her daughter, whom she didn't

want to see or talk to. The bitterness arose from Sabrina's decision to live with her father. Mrs. Curry also thought Sabrina was influencing the two boys to live with their father when they were old enough to choose.

According to lay witnesses, Mrs. Curry, with the possible exception of a few instances having no direct bearing on the case, appeared to be a normal person. She was unusually self-sufficient. During the early 1970's she built and occupied her own house, going to the lumberyard to select materials and learn how to use them. Even the doctors whose testimony supported the defense of insanity found Mrs. Curry to be of above average intelligence and testified that she would have seemed to be a normal person in ordinary matters.

The homicides occurred on the night of June 19, 1974. That morning there was a hearing in chancery court about the custody of the older son, Richard, who was 14 and chose to live with his father. Among the witnesses were four persons who were to be killed that night: the father, Sabrina, Richard, and Jessie, the younger son, aged 11. Mrs. Curry testified, among other things, that she had objected to the children's being allowed to make a choice of parents. She admitted having threatened to shoot her former husband. She had told Richard, in connection with the possibility of his leaving at 14, that if his father came to the house and tried to take the child's clothing and things away, "I'll blow his guts out." She said she made that statement because she felt like it. The court awarded Richard's custody to the father, effective the next day.

The bare facts about the homicides were stipulated, with some additional testimony. Apparently Mrs. Curry first killed her two sons at her home in Lowell. Shortly after midnight she drove her pickup truck to her former husband's home in Springdale and committed the two murders charged in the information. She shot Jimmy Lee Curry when he came to the door. She then went into Sabrina's room. When Sabrina asked who it was, Mrs. Curry answered in a calm voice, "It's your mother." She then turned on the light and shot Sabrina. She went next to the home of Jimmy Lee Curry's half-sister, in Springdale, and killed her. Her last visit was to the home of

her own sister's former husband, James Dodson, who lived west of Farmington. She shot Dodson twice, but not fatally. Dodson testified that his own divorce proceeding had been "— just about as nasty as you could get."

Mrs. Curry was arrested and taken to police headquarters in Fayetteville. One officer testified that the first thing Mrs. Curry said to him was, "I missed the sixth one, didn't I?" She seemed calm in answering questions as she was being booked, but she did say to an officer that she was not afraid of him and could kill him with two fingers. A matron at the jail testified that one morning while Mrs. Curry was in custody there she said she was happier than she had ever been, because her kids were in heaven.

There was expert testimony by four physicians: Dr. Bowers, Dr. Jenkins, Dr. Oglesby, and Dr. Taylor. They all thought that Mrs. Curry was not criminally responsible for the homicides. Three of them diagnosed her illness as paranoid schizophrenia. The fourth, Dr. Taylor, thought she suffered from paranoia only, but he had signed the staff report finding paranoid schizophrenia because such reports had to be unanimous. The opinions of the doctors were essentially similar. Dr. Bowers, for example, testified that Mrs. Curry had believed herself to be acting as a messenger of God or of the devil, whichever way she chose. She could not appreciate the criminality of her conduct. He did find it highly unusual that Mrs. Curry's first incident of paranoid schiizophrenia occurred at about age 36; the first incidents usually occur in the 20's. Dr. Jenkins said that Mrs. Curry believed that God was instructing her to do what she did. He said she was probably under a delusion at the time of the killings, though the psychosis can come and go with lucid intervals in between. She could have known that she was loading a gun, that she was pulling the trigger, that she was killing people, that they would be dead. All those things were consistent with her delusion.

The jury were instructed, in the language of AMCI 105, that they were not bound to accept an expert opinion as conclusive, that they should give it whatever weight they thought it should have, and that they might disregard any opinion

testimony found to be unreasonable. In a recent case involving a plea of insanity we pointed out that even though several competent experts agree and there is no opposing expert testimony, the jury must still decide the issue upon its own fair judgment. *Gruzen* v. *State*, 267 Ark. 380, 591 S.W. 2d 342 (1979).

We find substantial evidence to support the jury's verdict. The two homicides on trial were those of the defendant's former husband and 17-year-old daughter. Her hostility toward her husband had existed for some seven years; she had threatened, apparently more than once, to kill him. Her bitterness against her daughter had existed for three years and was such that she did not want to see the girl or to speak to her. Mrs. Curry was by no means incapable of rational thought; to the contrary, for all her life she had usually gone about the ordinary affairs of life in a normal manner. Upon the proof as a whole we cannot say that reasonable minds could not reach the conclusion reflected by the jury's verdict. Indeed, a contrary holding in the face of all the evidence supporting the verdict would be in effect to say that when the expert witnesses agree with one another the jurors can reach no other conclusion. That is not the law.

A second argument is that the court should have given a requested instruction, taken from the language of Ark. Stat. Ann. § 41-612 (Repl. 1977), explaining to the jury that even after a verdict of not guilty by reason of insanity the court would still have three alternatives, the first of which would be to commit the defendant to an appropriate institution if the defendant was found to be so affected by mental disease or defect as to present a risk of danger to herself or to the person or property of others. The other alternatives were also explained, the general effect being to tell the jury that Mrs. Curry would not automatically be released if found not guilty by reason of insanity.

Instructions such as this one have been considered in many cases. Annotation, 11 A.L.R. 3d 737 (1967). The argument in favor of the instruction is that jurors know the effect of verdicts of guilty or not guilty, but they do not know the effect of a finding of insanity and may return a verdict of guil-

ty to be certain that an insane person will not be prematurely released. On the other hand, the instruction raises questions foreign to the jury's primary duty of determining guilty or innocence. Moreover, it would hardly be possible to give a jury complete and accurate information about all the possible future decisions with respect to a person found to be not guilty by reason of insanity. In much the same way, it is not really practical to tell a jury all about the parole system, even though it has a practical effect upon any sentence to confinement in the Department of Correction. Our rule is that no effort should be made to explain the parole system to the jury, even if the jurors request an explanation. *Andrews v. State*, 251 Ark. 279, 472 S.W. 2d 86 (1971).

Upon the issue now presented the decisions in other jurisdictions are sharply divided, with the present trend being in favor of the giving of the instruction. In a case directly in point, however, we have held that such an instruction should not be given, because the jury is not officially concerned with the procedure to be followed after a verdict of not guilty by reason of insanity. *Campbell v. State*, 216 Ark. 878, 228 S.W. 2d 470 (1950). We have re-examined the question in the light of the more recent decisions and adhere to our position.

The appellant's remaining argument is that the trial judge unduly restricted defense counsel in their questions about prospective jurors' views about the defense of insanity. No objection was ever made that pinpointed an adverse ruling with regard to a specific question; so no error is shown. Indeed, we do not see that counsel were really restricted in any manner.

Affirmed.

Holt, J., concurs.

Hickman and Hays, JJ., dissent.

Frank Holt, Justice, concurring. I concur in the affirmance. It is true that in *Campbell v. State*, 216 Ark. 878, 228 S.W. 2d 470 (1950), we said that "[i]t was no official concern of the jury what procedure might be followed, as to appellant,

should he be found guilty because of insanity." However, the trend in recent years definitely gives approval, by statute or case law, to the instruction offered here. 11 A.L.R. 3d 737 (1967 and Supp. 1980). The rationale is summarized in *Commonwealth* v. *Mutina*, 366 Mass. 810, 323 N.E. 2d 294 (1975):

> On balance then, we believe it is best to entrust jurors with a knowledge of the consequences of a verdict of not guilty by reason of insanity. If jurors can be entrusted with responsibility for a defendant's life and liberty in such cases as this, they are entitled to know what protection they and their fellow citizens will have if they conscientiously apply the law to the evidence and arrive at a verdict of not guilty by reason of insanity — a verdict which necessarily requires the chilling determination that the defendant is an insane killer not legally responsible for his acts.

> The instant case represents a classic example of the injustice which may occur when such information is withheld from the jury. The jury could have had no doubt that the defendant killed Miss Achorn. The jury also heard overwhelming persuasive evidence that the defendant was insane at the time of the killing and that, for a long time into the future, he will remain a menace to himself and society. Foremost in their minds must have been concern for the safety of the community.

> In the absence of an instruction from the trial judge as to the effect of a verdict of not guilty by reason of insanity, the jurors sought to render justice both to the defendant and to society . . . .

Here is a classic example of the need for a proper instruction as a guideline for the jury. A previous jury could not reach a verdict. The trial proceedings here clearly indicate this jury's concern for society and the appellant. Two of the jurors were permitted to ask questions which were pertinent and searching as to appellant's continuing dangerousness to society, because of her illness, and the effect of continued treatment. The jury found mitigating circumstances in that her mental capacity was impaired at the time of the alleged

offense. It is common knowledge that a guilty verdict means that the defendant is subject to punishment, and that a not guilty verdict means the defendant goes free. It is not common knowledge that a not guilty verdict by reason of insanity does not necessarily mean freedom. Section 41-612 empowers the trial court, on a finding of not guilty by reason of insanity, to commit the defendant to the State Hospital to be placed in an appropriate institution or to order the defendant discharged or released on such conditions as the court deems appropriate. In other words, an acquittal does not necessarily mean freedom.

On this subject it appears it is for our legislature to determine whether an instruction, properly stating the law, should be given upon request.

DARRELL HICKMAN, Justice, dissenting. I join Justice Hays' dissent but would add that I disagree with this court's decision in *Andrews* v. *State*, 251 Ark. 279, 472 S.W. 2d 86 (1971) and with the statement in the majority opinion that the jury should not be instructed regarding the alternatives the law provides for people who are found not guilty by reason of insanity.

I have consistently opposed the idea that juries should set sentences. There are several reasons for my disagreement. First, a jury is in the least advantageous position to know what would be a fair sentence. A trial judge who hears cases day in and day out and is familiar with the entire criminal justice system is in a far better position to determine what a fair sentence is. Having the judge set the sentence would also lead to more uniformity.

We are required in many cases to reverse a trial court's judgment because an error has been made in the sentencing stage of a trial. This error can only be corrected if the case is remanded for a new trial or the sentence is reduced. Neither alternative is desirable. The accused has been found guilty by a jury and that finding has withstood appellate review. The only error involves the sentence. But the same jury cannot be brought back together again and, therefore, a new trial is required. On the other hand, a reduced sentence is not satisfac-

tory to the State because it usually involves a repeat offender who should *not* receive lenient treatment.

Even so, the law requires that the jury impose the sentence and we should not deny the jury the benefit of information that it should have in order to make a fair judgment regarding punishment. The jury should know about the parole system. A judge knows about it when he imposes the sentence. So what if the parole system is complicated? Trials are complicated and the law is complicated. We trust the jury to decide whether the people should live or die; surely we can trust them to use this needed information in an evenhanded way. Therefore, I would overrule *Andrews* and I would allow an instruction such as that proposed in this case.

STEELE HAYS, Justice, dissenting. I view the evidence of insanity of this appellant as overwhelming. Three psychiatrists and a clinical psychologist testified to their opinion that Shirley Marie Curry was psychotic to the extent of being incapable of appreciating the criminality of her conduct or conforming her behavior to the requirements of the law. There was no expert testimony to the contrary. The lay testimony was insubstantial, limited with one exception, to witnesses who saw the appellant once, briefly, and could offer little other than that she "appeared normal." The one witness for the state who had any continuing contact with her corroborated the mental aberrations and delusional episodes considered so significant by the experts.

Above all else, the crime itself attests to the legal irresponsibility of the perpetrator. When a mother, with cool deliberation, murders her two sons in their bed, to whom she is said to be "devoted," murders her teenage daughter, her former husband, her former sister-in-law, and attempts yet another inner-family murder, all directed by either God or the devil, depending on which delusion is current, the product of a badly deranged mind is inescapable.

The evidence relied on to affirm this conviction includes reference to appellant's calm demeanor during and after the crimes. In reality, this is evidence to the contrary. One who can conduct the calculated assassination of a family with

calm and remain so afterwards demonstrates a derangement far better than someone who becomes distraught. The experts were cognizant of this abnormality, whereas the layman misread it.

I recognize that under the law the jury may ignore competent, expert testimony of insanity even in the absence of opposing expert testimony, but if lay testimony consists of little more than superficial observations that the defendant "appeared normal" then it fails to meet the requirement of substantiality when weighed against the combined, uncontradicted testimony of four specialists in the field of psychiatry, whose opinions are based on extensive testing, observation and interview with the appellant. While, as here, the totality of the evidence is so convincing that reasonable minds can come to no other conclusion then it becomes our duty to reverse.

Justice Hickman joins in this dissent.