STATE of Utah, Plaintiff and Appellee,

v.

Thomas Adison SHICKLES,
Defendant and Appellant.

No. 20048.

Supreme Court of Utah.

June 24, 1988.

1. *See State v. Jacob,* 669 P.2d 865 (Utah 1983).

Lynn R. Brown, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Dave B. Thompson, Salt Lake City, for plaintiff and appellee.

STEWART, Justice:

Thomas Shickles was charged with and convicted of child kidnapping, a first degree felony, pursuant to Utah Code Ann. § 76–5–301.1 (Supp.1987).[1] The trial court sentenced defendant to a minimum mandatory prison term of ten years and a maximum term that may be for life.[2]

## I. FACTS

Shickles met the victim's family through a roller skating club in Kearns, Utah, and a friendly relationship developed between the family and defendant. Shickles frequently visited the victim's family home in Sandy, Utah, and occasionally spent the night there. He even went with them on a three-day ice skating trip to Greeley, Colorado. Because of the friendship that developed, the parents permitted Shickles to take their children various places, such as the planetarium and the movies. Despite the parents' desire that one child not be singled out for attention, defendant became closer to the eight-year-old daughter ("M.") than to the other children.

On the morning of June 3, 1983, Shickles visited the family's home. The victim's mother, who was concerned that she would be late for work, asked defendant to take her three daughters to the babysitter, the mother's sister. Shickles arrived at the sitter's home with the three girls at about 1:30 p.m. and left immediately thereafter, taking M. with him. The sitter was not concerned because defendant was a family

---

1. Section 76–5–301.1 states in pertinent part:
   (1) A person commits child kidnapping when the person intentionally or knowingly, without authority of law and against the will of the victim, by any means and in any manner, seizes, confines, detains, or transports a child under the age of 14 with intent to keep or conceal the child from its parent, guardian, or other person having lawful custody or control of the child.
   (2) A seizure, confinement, detention, or transportation is deemed to be against the will of the victim if the victim is younger than 14 years of age at the time of the offense, and the seizure, confinement, detention, or transportation, [sic] is without the effective consent of the victim's custodial parent, guardian, or person acting in loco parentis.

2. Section 76–5–301.1(4) provides as follows:
   Child kidnapping is a felony of the first degree punishable by a term which is a minimum mandatory term of imprisonment of 5, 10, or 15 years, and which may be for life.

friend and often took the children with him on errands. When M. was not returned by midnight, the police were notified.

After Shickles left the sitter's home, he drove with M. to his employer's place of business to pick up a payroll check, then to the bank to deposit the check, and finally to the Salt Lake International Airport, where he purchased two one-way tickets to Denver, Colorado, in the name of Mr. "T.K." (an alias) and Miss "M.K." He told M. that they were going to Denver to purchase a ring for her aunt which she had seen and admired during the trip to Greeley, Colorado. Shickles also told M. that he had permission from her parents to take her with him and that he was going to buy her some clothes. In Denver, Shickles checked into a motel, where he and M. spent the night and a portion of the next day. He showered naked with M. three times and engaged in at least three separate incidents of sexual activity with her. There were no external signs that Shickles physically harmed her.

On the afternoon of June 4, Shickles checked out of the motel, taking M. with him, and took his luggage to a locker at a Denver bus station. From the bus station, he called members of M.'s family, who notified the police. At about 9:00 that evening, FBI agents arrested him at the bus station and took custody of M. During the next few days, FBI agents questioned Shickles in Denver. At first, defendant denied that he had assaulted M., but then said that both he and "Tea"[3] had been aroused by M., had fondled her, and had had intercourse with her. He also told the FBI agents that he had always had permission to take M. anywhere as long as he did not hurt her and that his purpose in taking M. to Denver was to purchase a ring for M.'s aunt, who, along with Shickles, had seen the ring in a store window in Greeley. Later, he stated he took M. to Denver to

get her away from her family so that he could be alone with her.

Upon defendant's return to Salt Lake City, he was charged with child kidnapping. The State chose not to charge Shickles with sexual abuse, apparently because of lack of jurisdiction to try Shickles for the acts committed in Denver, Colorado. Shickles pleaded not guilty by reason of insanity, and the trial court appointed two alienists to examine him. At trial, Dr. Mark Rindflesh testified that he believed Shickles suffered from a multiple personality disorder at the time of the incident. Dr. Robert Greer also diagnosed Shickles as having a dissociative disorder, i.e., a psychogenic fugue, which was psychologically generated and caused flight from reality.

At the conclusion of the trial, the jury was given four verdict forms: guilty, not guilty, not guilty by reason of insanity, and guilty and mentally ill. The jury returned a verdict of guilty and mentally ill.

Thereafter, a sentencing hearing was held to determine whether Shickles should receive a five-, ten-, or fifteen-year mandatory minimum sentence. The State presented no evidence of aggravation; it argued that the court should impose a ten-year-to-life sentence. In mitigation, Shickles called Dr. Rindflesh, who testified that in his opinion, defendant lacked a culpable mental state. Defendant's mother also testified for him.

The trial court imposed a mandatory minimum term of ten years with a maximum term that may be for life. Because of the testimony of Dr. Rindflesh, the trial court ordered that defendant be sent to the state mental hospital for an evaluation to assist the court in determining whether to reduce the mandatory ten-year minimum term to a mandatory minimum five-year sentence.[4]

---

3. According to one of the defense experts, Shickles suffered from multiple personalities. "Tea" may have been one of those personalities. The children all called defendant "Tea" instead of Tom. Shickles had a T-shirt with the name "Tea" on it.

4. Section 76-3-201(8) (Supp.1985) (amended 1986 & 1987) stated:

If a defendant subject to this section has been sentenced and committed to the Utah state prison, the court may, within 120 days of the date of commitment on its own motion, or at any time upon the recommendation of the board of pardons, recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if he had not previously been sentenced, so long

After the evaluation, the trial court declined to reduce the sentence but ordered Shickles confined in the state hospital.

## II. EVIDENCE OF PRIOR CRIMINAL CONDUCT

Defendant's first point on appeal is that the trial court erred in admitting evidence of defendant's sexual assaults on M. when the only crime for which he was tried was kidnapping. Before trial, defendant made a motion *in limine* to exclude evidence of his sexual misconduct against M. during the Denver trip on the ground that the evidence was irrelevant to the charge of kidnapping and highly prejudicial. The trial court denied the motion.

Shickles contends that the evidence was highly inflammatory, had little or no probative value, and, therefore, was inadmissible under Rule 403 of the Utah Rules of Evidence.[5] Specifically, he contends that the evidence was irrelevant under Rule 404(b) to prove child kidnapping because the State needed to prove only that defendant took the victim without the consent of her parents. Shickles argues that his unlawful intent could be inferred from the act itself and that the challenged evidence was wholly unnecessary.

Rule 404(b) of the Utah Rules of Evidence provides that evidence of other crimes is admissible under restricted circumstances:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The general rule prohibiting evidence that a defendant committed other crimes was established, not because that evidence is logically irrelevant, but because it tends to skew or corrupt the accuracy of the fact-finding process. Indeed, Dean Wigmore has argued, "It is objectionable not because it has no appreciable probative value but because it has too much." 1A J. Wigmore, *Evidence in Trials at Common Law* § 58.2, at 1212 (Tillers rev. 1983). Thus, evidence of other crimes is generally inadmissible unless it tends to have a special relevance to a controverted issue and is introduced for a purpose other than to show the defendant's predisposition to criminality. *State v. Saunders*, 699 P.2d 738, 741 (Utah 1985).

Even if evidence of other crimes is probative of a particular element of a crime and is not offered merely to show criminal predisposition, such evidence is not automatically admissible under Rule 404(b). 10 J. Moore & H. Bendix, *Moore's Federal Practice*, § 404.21[2] (2d ed. 1988). Its tendency to lead the finder of fact to an improper basis for decision must still be balanced against its probative value and the need for such evidence in proving a particular issue. E. Cleary, *McCormick on Evidence*, § 190, at 565 (3d ed. 1984) suggests the factors to be evaluated in the balancing process:

> The problem is not merely one of pigeonholing, but of classifying and then balancing. In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative

as the new sentence is no greater than the initial sentence. The resentencing provided for in this section shall comply with the sentencing rules of the Utah Judicial Council so as to eliminate disparity of sentences and to promote uniformity of sentencing. Credit shall be given for time served.

5. Rule 403 of the Utah Rules of Evidence states:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

■ In this case, the trial court held that the prior crime evidence was admissible because it was relevant to intent. To prove the crime defined by § 76–5–301.1, the State had to prove that defendant transported M. to Denver with the intent "to keep or conceal the child from [her] parent[s]. ..." That required more than simply proving a general intent to commit the prohibited act, as Shickles contends. Indeed, the element of intent was complicated in this case because Shickles frequently took M. to various activities with parental permission. In fact, defendant claimed consent on the part of the parents, and he also claimed that his acts were the product of insanity. Although the prosecution adduced other evidences of defendant's intent, such as defendant's own admission that he had taken M. to Denver to get her away from her family, that did not necessarily bar the use of the other-crimes evidence, particularly because intent and mental state were hotly contested issues. Evidence of defendant's illicit conduct with M. was directly probative of the proposition that defendant took M. to Denver with the requisite intent and without a good faith belief that he had implied permission from M.'s parents.

Thus, because of the unique facts of this case, the probative value of the other-crimes evidence was sufficiently high to justify its admissibility despite its clearly prejudicial nature. Of course, defendant was entitled to a clear instruction to the jury strictly limiting the use it could make of the evidence.

## III. INSTRUCTION ON CONSEQUENCES OF VERDICT OF NOT GUILTY BY REASON OF INSANITY

Defendant also challenges the trial court's refusal, in its general charge to the jury, to give a requested instruction explaining the consequences of a verdict of not guilty by reason of insanity, one of the four verdict forms given the jury. Defense counsel specifically objected to the court's refusal to give his requested instruction.[6]

■ Ordinarily, a jury is not informed of the punishment that might be imposed on a defendant found guilty of a particular crime. The length of a possible sentence is generally thought to be irrelevant to the issue of guilt or innocence, and in most cases, juries need only decide to return a verdict of either guilty or innocent. This case is different from the ordinary case, however. The jury was not given an either/or decision; it had to choose one of four verdicts. To make an intelligent, rational choice, the jury needed an explanation of those verdicts that were not self-evident. Specifically, the jury needed to know the consequence of the guilty and mentally ill verdict and the not guilty by reason of insanity verdict, since they have a less than obvious meaning and effect. To fulfill the legislative purpose in providing these two types of verdicts, juries must know the effect the verdicts will have.

■ A verdict of not guilty by reason of insanity has significantly different consequences from a verdict of guilty and mentally ill, although both, in effect, constitute a finding that the defendant committed the *actus reus* of the crime charged. From an analytical point of view, however, the difference is that a verdict of not guilty by reason of insanity indicates the mental

---

6. Defense counsel stated:

> The defendant objects to the failure of the court to give defense's requested Instruction No. 17 that outlines the procedure that will happen if the defendant is found not guilty by reason of insanity. The jury should have knowledge of the procedure that will take place if the verdict of not guilty by reason of insanity is rendered.

*See State v. Elliott,* 641 P.2d 122 (Utah 1982) (objections or exceptions to instructions made after the jury retires to deliberate are timely if the procedure is sanctioned by the trial judge). We acknowledge that defendant's proposed instruction was in error in one minor respect. The instruction stated that a court would review a commitment yearly, instead of every six months. The error was not significant and would not have misled the jury on any issue in the case. The error favored the prosecution, in any event, if, indeed, it can be said that it favors anyone.

illness is so severe that the *mens rea* necessary to convict of the crime does not exist, whereas the verdict of guilty and mentally ill indicates that the requisite *mens rea* does exist even though the defendant is mentally ill. *See generally* Hermann & Sor, *Convicting or Confining? Alternative Directions in Insanity Law Reform: Guilty But Mentally Ill Versus New Rules for Release of Insanity Acquittees,* 1983 B.Y.U.L.Rev. 499. Yet, unless the insanity is only temporary—a rare occurrence and one that does not exist here—the defendant will still be committed to the state mental hospital for an indeterminate time. If, however, a jury mistakenly believes that a dangerous defendant, who on the basis of the evidence is entitled to a verdict of not guilty by reason of insanity, will be released outright, the jury might improperly return a verdict of guilty and mentally ill or simply guilty. Although we agree with the general proposition that a jury need not be instructed on the penalties attached to particular crimes since it is not the jury's prerogative to determine the appropriate sentence, that principle does not apply when a case concerns possible verdicts of not guilty by reason of insanity or guilty and mentally ill because it most assuredly is the jury's duty to return a proper verdict, and to do that it must understand the alternatives.

Clearly, "guilty" and "not guilty" verdict forms require no special explanations to the jury. Jurors know that guilty verdicts in criminal cases subject defendants to possible imprisonment and fines. However, a

verdict of guilty and mentally ill is new to our law, and its effect and meaning are not self-evident. That verdict first came into our law in 1983, *see State v. DePlonty,* 749 P.2d 621, 625 n. 1 (Utah 1987), and its functions and effect are not clear, either on its face or when compared with a verdict of not guilty by reason of insanity, especially since mental illness is a component of both verdicts. Furthermore, there is a popular misconception that a verdict of not guilty by reason of insanity means that a court loses the power to protect the public from a dangerous defendant.

Although many jurisdictions have held that a jury need not be instructed on the treatment of a defendant found not guilty by reason of insanity,[7] very few have dealt with the problem in a case involving the additional verdict of guilty and mentally ill, as in this case.[8] A number of courts, however, have held that whether an instruction on the effect of a verdict of not guilty by reason of insanity should be given lies within the discretion of the trial judge. *See, e.g., State v. Wade,* 96 Conn. 238, 113 A. 458 (1921); *Nelson v. State,* 35 Wis.2d 797, 151 N.W.2d 694 (1967). Wisconsin holds that such an instruction is preferred because of the possibility that jurors, who may erroneously believe that a verdict of not guilty by reason of insanity results in release rather than confinement in a mental institution, may be improperly biased against such a verdict. *State v. Shoffner,* 31 Wis.2d 412, 428, 143 N.W.2d 458, 465 (1966).[9]

---

7. *See, e.g., Pope v. United States,* 372 F.2d 710 (8th Cir.1967), *vacated on other grounds,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Curry v. State,* 271 Ark. 913, 611 S.W.2d 745 (1981); *State v. Gratiot,* 104 Idaho 782, 663 P.2d 1084 (1983); *People v. Pitts,* 104 Ill.App.3d 451, 60 Ill.Dec. 163, 432 N.E.2d 1062 (1982); *State v. Hamann,* 285 N.W.2d 180 (Iowa 1979); *State v. Park,* 159 Me. 328, 193 A.2d 1 (1963); *People v. Goad,* 421 Mich. 20, 364 N.W.2d 584 (1984); *Gambrell v. State,* 238 Miss. 892, 120 So.2d 758 (1960); *State v. French,* 166 Mont. 196, 531 P.2d 373 (1975); *State v. Lujan,* 94 N.M. 232, 608 P.2d 1114 (1980), *overruled on other grounds, Sells v. State,* 98 N.M. 786, 653 P.2d 162 (1982); *People v. Nagle,* 26 N.Y.2d 707, 257 N.E.2d 51, 308 N.Y.S.2d 872 (1970); *State v. Huber,* 361 N.W.2d 236 (N.D.) *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2339, 85 L.Ed.2d 855 (1985); *Boutwell*

*v. State,* 659 P.2d 322 (Okla.Crim.App.1983); *State v. Valenti,* 265 S.C. 380, 218 S.E.2d 726 (1975); *Heflin v. State,* 640 S.W.2d 58 (Tex.Ct. App.1982); *State v. Hood,* 123 Vt. 273, 187 A.2d 499 (1963); *Spruill v. Commonwealth,* 221 Va. 475, 271 S.E.2d 419 (1980); *Lonquest v. State,* 495 P.2d 575 (Wyo.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972).

8. *See, e.g., Cooper v. State,* 253 Ga. 736, 325 S.E.2d 137 (1985); *People v. Ramsey,* 422 Mich. 500, 375 N.W.2d 297 (1985).

9. Nevada allows the trial judge to use his discretion in determining whether to instruct, but the refusal to instruct is not reversible error. *Bean v. State,* 81 Nev. 25, 398 P.2d 251 (1965), *cert. denied,* 384 U.S. 1012, 86 S.Ct. 1932, 16 L.Ed.2d

A growing number of courts have held that jury instructions should explain the consequences of a verdict of not guilty by reason of insanity. Some jurisdictions allow the instruction if it is requested by the defendant or by the jurors. *See, e.g., Schade v. State,* 512 P.2d 907 (Alaska 1973); *People v. Moore,* 166 Cal.App.3d 540, 211 Cal.Rptr. 856 (1985); *People v. Thomson,* 197 Colo. 232, 591 P.2d 1031 (1979); *State v. Babin,* 319 So.2d 367 (La. 1975); *Commonwealth v. Mutina,* 366 Mass. 810, 323 N.E.2d 294 (1975); *State v. Hammonds,* 290 N.C. 1, 224 S.E.2d 595 (1976); *State v. Daggett,* 167 W.Va. 411, 280 S.E.2d 545 (1981). Other jurisdictions *require* that such an instruction must be given unless the defendant expressly objects. *Lyles v. United States,* 254 F.2d 725 (D.C.Cir.1957) (opinion by Judges Prettyman and Burger), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), *cert. denied,* 362 U.S. 943, 80 S.Ct. 809, 4 L.Ed.2d 771 (1960), *cert. denied,* 368 U.S. 992, 82 S.Ct. 610, 7 L.Ed.2d 529 (1962); *Roberts v. State,* 335 So.2d 285 (Fla.1976); *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975); *Commonwealth v. Mulgrew,* 475 Pa. 271, 380 A.2d 349 (1977).[10]

In *Lyles,* 254 F.2d at 728, then Judge, and later Chief Justice, Burger, writing for a majority of the Court of Appeals for the District of Columbia Circuit, declared that a jury has a right to know the full meaning of the verdict of not guilty by reason of insanity:

> Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning.... It means neither freedom nor punishment.

It means the accused will be confined in a hospital for the mentally ill until the superintendant of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others.... [T]he jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts.

We are convinced that the risk articulated in *Lyles* is substantial, i.e., that a jury may ignore the evidence of insanity if the jury misunderstands the consequences of a verdict of not guilty by reason of insanity and focuses instead on the fear that such a verdict will result in releasing a dangerous person to prey upon society. Freed from confusion and fear as to the practical effect of a verdict of not guilty by reason of insanity, jurors should be able to decide the insanity issue solely on the evidence and law governing the defense.

We observe that this reasoning applies with equal force to a verdict of guilty and mentally ill, as set forth in § 77–35–21.5 (Supp.1987). Although that issue was not raised in the trial of this matter, it stands on the same principles that require explaining a verdict of not guilty by reason of insanity and may arise on the retrial of this matter.

In sum, we hold that defendant's requested instruction on not guilty by reason of insanity should have been given to assure that the jury properly considered the insanity defense.

■ A related, but separate, issue is raised by defendant's contention that during closing argument to the jury the prosecutor misled the jury as to the effect of a verdict of not guilty by reason of insanity. One of the prosecutor's remarks went to the consequence of a verdict of not guilty by reason of insanity, the subject matter of the proposed instruction referred to above.

---

1030 (1966); *Kuk v. State,* 80 Nev. 291, 392 P.2d 630 (1964).

**10.** Two jurisdictions statutorily require an instruction when the defense of insanity is raised. *E.g.,* Kan.Stat.Ann. § 22–3428(6) (Supp.1987);

Tenn.Code Ann. § 33–7–303(e) (Supp.1987). Two other states have statutes which require an instruction if requested by the defendant. *E.g.,* Hawaii Rev.Stat. § 704–402(2) (1985); Mo.Rev. Stat. § 552.030(6) (1986).

During closing argument in rebuttal, the prosecutor stated:

And one [defense counsel] mentioned, not guilty by reason of insanity. And he made the comment, what that does is say yes, there was a crime, and using his words, a crime, but Mr. Shickles is excused from it. That is the ramifications of not guilty by reason of insanity. He walks out the door. And I think that is the real question that we've got before us here now is the accountability.

This remark engendered the following exchange between the prosecutor and defense counsel:

Mr. Brown [defendant's attorney]: Objection, Your Honor. Not guilty by reason of insanity is not that he walks out the door. I object to that.

Mr. Gunnarson [prosecutor]: This Court loses jurisdiction is my understanding.

Mr. Brown: Well, this Court doesn't lose jurisdiction. I object to that comment.

Mr. Gunnarson: I will withdraw that comment and I will go by Mr. Brown's statement, he is excused from it.

The trial judge did nothing to dispel the erroneous impression created; indeed, the trial judge did not even rule on the objection. After the jury retired to deliberate, defense counsel moved for a mistrial:

To clear the record, Your Honor, I would move at this time for a mistrial based on Mr. Gunnarson's closing remarks where he mentioned the fact that a not guilty by reason of insanity would mean the defendant would be released to go home, or words to that effect, which is not a correct statement of the law, and I think that a comment like that to the jury is highly prejudicial and I would ask the court to consider a mistrial based on that.

The trial court denied the motion for a mistrial. Defense counsel thereafter objected to the trial court's failure to give the defense's requested instruction explaining a verdict of not guilty by reason of insanity.

Section 77–14–5 (Supp.1987) sets forth the procedure to be followed when a defendant is found not guilty by reason of insanity. *Cf. State v. DePlonty,* 749 P.2d 621 (Utah 1987). That section provides, in pertinent part:

(1) When a jury renders a verdict or a court enters a finding of "not guilty by reason of insanity", the court shall then conduct a hearing within five days to determine if the defendant is presently mentally ill. The defense counsel and prosecutors may request further evaluations and may present testimony from those examiners.

(2) After the hearing and upon consideration of the record, if the court finds by clear and convincing evidence that the defendant is still mentally ill and because of that mental illness presents a substantial danger to himself or others, the court shall order him committed to the Utah state hospital. The defendant shall not be released from confinement therein until the court which committed the defendant shall, after hearing, find that the defendant has recovered from his mental illness.

In this case, the prosecutor misstated the law twice during his closing argument. His first misstatement was that the defendant "walks out the door" if found not guilty by reason of insanity. Although this statement provoked a timely and appropriate objection, the prosecutor again misstated the law by declaring, "This court loses jurisdiction [if the defendant is found not guilty because of insanity]." Again, a timely objection was interposed. In response, the prosecutor stated that he withdrew the comment, which could be understood to apply only to his statement about jurisdiction. The first misstatement, about walking out the door, if not the second about jurisdiction, remained before the jury, and the trial court did nothing to correct either.

Clearly defendant was entitled to have the trial court rule on his objections, and at the least, both should have been sustained. In addition, both of the prosecutor's erroneous statements should have been stricken. The prosecutor's withdrawal did not have the force of a ruling by the Court, and in any event, it did not clear up the issue that

the prosecutor interjected into the case. The prosecutor's later argument on the motion for a mistrial, that he was merely responding to defense counsel's earlier statement that insanity was an excuse, was disingenuous. As an affirmative defense, insanity is an "excuse" to the crime, and defense counsel's use of that term did not justify the statement by the prosecutor that defendant would walk out the door.

Although defense counsel did not request a curative instruction in connection with the objection, he clearly preserved his claim of error by his timely objection and his motion for a mistrial. Beyond that, had the trial court given defendant's requested instruction on not guilty by reason of insanity, the difficulty in closing argument would probably not have arisen.

Even in jurisdictions which hold that the defendants are not ordinarily entitled to such an instruction, an instruction has been required where the jury has been given an erroneous view of the law by the prosecutor. *See, e.g., Dipert v. State*, 259 Ind. 260, 262, 286 N.E.2d 405, 407 (1972); *State v. Huber*, 361 N.W.2d 236, 238 (N.D.), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2339, 85 L.Ed.2d 855 (1985). In *Dipert*, the prosecutor on *voir dire* examination of the jury was asked by a prospective juror what would happen if the defendant was found not guilty by reason of insanity, to which the prosecutor answered that the defendant would go "scot free." *Id.* at 261, 286 N.E.2d at 406. The defense attorney immediately objected and asked that the jury be admonished to disregard the prosecutor's remarks and instructed that a hearing would be held following the trial with respect to the defendant's mental condition if the jury found him not guilty by reason of insanity. The trial court refused both requests. In reversing the defendant's conviction, the Indiana Supreme Court held that because of the misstatement of the law, the defendant was entitled to have the jury instructed as to the procedures that would be followed if a verdict of not guilty by reason of insanity were returned: "[A] defendant, through an appropriate channel, such as a curative instruction or statement by the judge, will be entitled to inform the jury of such procedures where an erroneous view of the law on [the] subject has been planted in their minds." *Id.* at 262, 286 N.E.2d at 407; *cf.* Annotation, *Prejudicial Effect of Argument or Comment that Accused, if Acquitted on Ground of Insanity, Would be Released from Institution to Which Committed*, 44 A.L.R.2d 978 (1955 & Supp.1980, 1988).

In *Dipert*, defense counsel sought a curative instruction immediately after the prosecutor's erroneous remark, whereas here defense counsel objected but did not seek a curative instruction even though he had sought an explanatory instruction in the general charge to the jury earlier in the case. The trial judge during closing argument should have sustained defense counsel's objections and ordered the erroneous statements stricken, although that alone, without a proper instruction, would still have been inadequate.

Given the posture of the case when the statement was made, at the end of trial during closing arguments and the misleading impact that the statement may well have had on the jury, the error in this case was clearly prejudicial, even though the evidence of guilt is substantial. The affirmative defense of insanity, if proved, is valid even though the State has proved convincingly every element of the *actus reus* of the offense charged. Even overwhelming evidence of guilt cannot dispose of the defendant's claim that he was not guilty by reason of insanity; indeed, the defendant could have conceded guilt and still have been found legally insane. Significantly, the jury found defendant "guilty and mentally ill," which indicated at least partial acceptance of defendant's experts' testimony. Had the jury not been misinformed and uninformed about how defendant would have been dealt with pursuant to a verdict of not guilty by reason of insanity, the jury might have returned that verdict. *See State v. Troy*, 688 P.2d 483, 486 (Utah 1984).

In any event, Shickles had the right to have the jury rule squarely and knowledgeably on his defense. Accordingly, we reverse the judgment of the trial court and

remand for a new trial. We note that on retrial, the jury should be instructed as to the consequences of the verdicts of guilty and mentally ill and not guilty by reason of insanity, if defendant asks for such instructions.

We also address defendant's remaining points on appeal because they may arise again on retrial.

## IV. PROSECUTORIAL COMMENT ON DEFENDANT'S POST–MIRANDA SILENCE

Defendant asserts that his privilege against self-incrimination was violated by a remark made by the prosecutor at trial. At trial, an FBI agent, testifying for the State, went on at some length on direct examination about statements he had made to Shickles at the time of arrest. At that point, defense counsel made the following objection:

> Your Honor, I move to have all of that stricken. He goes on for five minutes talking about all the things he said to Mr. Shickles and there is no response to that. I would move the court to have that stricken from the record.

Before the court ruled on the objection, the prosecutor argued:

> I think an inference can be drawn from that, as long as the *Miranda* warning has been given, whether he answers or not. Accusations are made, he remains silent, I think there is an implication there that can be reasonably drawn.

Defendant made no objection to the prosecutor's statement, and the court then overruled defendant's motion to strike.

On appeal, Shickles argues that the prosecutor's statements constituted misconduct. The State responds that defense counsel made no specific objection to the prosecutor's statement, and, therefore, Shickles is precluded from raising the issue on appeal. The State's point is well taken. An objection must be both timely and specific. *State v. McCardell*, 652 P.2d 942 (Utah 1982). Here, an objection was raised to the FBI agent's statement, but no objection was raised to the prosecutor's statements. Therefore, the issue is not properly

before us. *See State v. Hales*, 652 P.2d 1290 (Utah 1982).

## V. CONSTITUTIONALITY OF THE MINIMUM MANDATORY SENTENCING SCHEME

Shickles also challenges the constitutionality of § 76–5–301.1(4), which provides for a minimum mandatory term of imprisonment of five, ten, or fifteen years and that may be for life. He contends that the statute is unconstitutional because (1) it constitutes cruel and unusual punishment in that the sentences are disproportionate to the crime of kidnapping, (2) it infringes on inherent judicial power and authority, (3) it invades the province of the Board of Pardons, and (4) the sentencing scheme is unconstitutionally vague.

Defendant's first three arguments were addressed and rejected in *State v. Bishop*, 717 P.2d 261 (Utah 1986), where we sustained the constitutionality of § 76–5–403.1 (Supp. 1987) (minimum mandatory sentencing required upon conviction of sodomy upon a child). *Bishop* specifically concluded that the harshness of the statutory sentencing scheme is not so disproportionate that it constitutes cruel and unusual punishment, that the Legislature of this state has the sole power to fix punishment, and that the power of the Board of Pardons to grant parole contained in article VII, section 12 of the Constitution of Utah is explicitly subject to conditions established by the Legislature. 717 P.2d at 263–65, 267–72. *See also State v. Bell*, 754 P.2d 55 (1988); *State v. Egbert*, 748 P.2d 558 (Utah 1987); *State v. Gerrish*, 746 P.2d 762 (Utah 1987).

Defendant's remaining challenge to the constitutionality of the sentencing statutes is grounded upon vagueness. Similar vagueness challenges were rejected in *State v. Egbert* and *State v. Bell*. *Egbert* and *Bell* both held that the provisions of § 76–5–405(2) (Supp.1985) (amended 1986) are not unconstitutionally vague. For analytical purposes, sentencing under §§ 76–5–405(2) and 76–5–301.1 is identical. *See State v. Bishop*. Child kidnapping is

punishable by imprisonment for a minimum mandatory term of five, ten, or fifteen years. Upon conviction, § 76–3–201(5)[11] comes into consideration, and it is likewise couched in clear, unequivocal language. It mandates "imposition of the term of middle severity unless there are circumstances in aggravation or mitigation of the crime," whereupon the sentence of either the highest or the lowest severity must be considered. Based on our earlier cases, defendant's arguments are without merit.

## VI. VALIDITY OF SENTENCE

■ Defendant's final point is that the trial court abused its discretion in sentencing him to the presumptive ten-year term of middle severity rather than to the lower five-year term and by failing to state its reasons for doing so.

The State offered no evidence of aggravation, urging instead that defendant be sentenced to the term of middle severity. Shickles sought the minimum five-year term. In mitigation, he presented the testimony of his mother concerning his childhood. She also testified that he was raised in a broken home, received psychiatric counseling and therapy as a runaway, was twice divorced, functioned well in the military, and was incarcerated for a year in North Carolina for obtaining a car under false pretenses. Shickles also called Dr. Rindflesh, who testified that defendant had a nonculpable mental state at the time the crime in question occurred. Although he acknowledged that none of the other psychiatrists who had examined defendant agreed with his diagnosis, Dr. Rindflesh testified that defendant suffered from a condition of multiple personalities and that one of defendant's other personalities, over whom defendant had no control, committed the criminal acts.

The trial court was, of course, free to accept or reject Dr. Rindflesh's diagnosis, particularly in light of the inconsistent evidence of defendant's mental state presented at trial. Cf. State v. Carlsen, 638 P.2d 512, 514–15 (Utah 1981), cert. denied, 455 U.S. 958, 102 S.Ct. 1469, 71 L.Ed.2d 676 (1982). But cf. State v. DePlonty, 749 P.2d 621 (Utah 1987) (in light of uncontroverted evidence of defendant's mental illness, trial judge's refusal to find defendant mentally ill constitutes clear error). Likewise, the trial court was free to accord whatever weight it deemed appropriate to the testimony of defendant's mother. The record reflects that the court plainly gave due consideration to the testimony of both witnesses. The court directed a number of questions to Dr. Rindflesh and even called him back a second time to explain further the rationale of his diagnosis.

Clearly the trial judge was impressed with, and influenced to some extent by, the testimony of Dr. Rindflesh. Because of the information furnished by Dr. Rindflesh and his conclusion that something could be gained by further study during defendant's stay at the mental hospital, the court stated that it wanted additional information and ordered a 180-day mental examination at the state hospital. The court indicated that after the examination it would consider reducing the sentence.

Accordingly, we have no reason to believe that the trial court's imposition of the middle term was an abuse of its discretion. Nevertheless, the trial court did err in failing to make a record of the reasons for its choice of sentence as required by § 76–3–201(6)(b) (Supp.1987). As held in

---

11. Utah Code Ann. § 76–3–201(5) (Supp.1985) (amended 1986 & 1987) stated:

If a statute under which the defendant was convicted mandates that one of three stated minimum terms must be imposed, the court shall order imposition of the term of middle severity unless there are circumstances in aggravation or mitigation of the crime. Prior to or at the time of sentencing, either party may submit a statement identifying circumstances in aggravation or mitigation or to present additional facts. If the statement is in writing, it shall be filed with the court and served on the opposing party at least four days prior to the time set for sentencing. In determining whether there are circumstances that justify imposition of the highest or lowest term, the court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to section 76–3–404, and statements in aggravation or mitigation submitted by the prosecution or the defendant, and any further evidence introduced at the sentencing hearing.

*State v. Bell*, 754 P.2d at 58, a trial court is required by statute to state its reasons for the imposition of any of the possible terms provided in § 76–3–201. The trial court should have done so here.

Reversed and remanded for further proceedings.

HALL, C.J., HOWE, Associate C.J., and DURHAM, J., concur.

ZIMMERMAN, Justice (concurring):

I join the majority in reversing Shickles' conviction. However, I write separately both to elaborate on the rationale for my conclusion that the trial court must state reasons for imposing a sentence of middle severity and to explain a point of disagreement with the majority regarding the failure to adequately instruct as to the consequences of the verdicts.

First, I agree that the trial court erred in not explaining why it imposed the sentence of middle severity. Section 76–3–201(6)(b) of the Code requires a statement of "reasons for [any] sentence choice." Utah Code Ann. § 76–3–201(6)(b) (Supp.1987). On the other hand, section 76–3–201(5)(d) requires that when a court imposes a minimum mandatory term higher or lower than the middle term specified by statute, that court must "set forth on the record the facts supporting and reasons for imposing the upper or lower term." Utah Code Ann. § 76–3–201(5)(d) (Supp.1987). These two provisions appear to conflict, because the former seems to require a statement of reasons for every sentencing choice, while the latter requires explanation only when either the high or low, but not the middle minimum mandatory term is selected. One way to resolve this conflict is to conclude that section 76–3–201(6)(b) is effectively superseded by section 76–3–201(5)(d) in cases involving mandatory minimum terms. Under this reading, if the term of middle severity is imposed no reason must be given for that choice. I do not find such a reading of these sections compelling.

Both subsections currently numbered (5)(d) and 6(b) were enacted in 1983 as subsections (6) and (9), respectively, of section 76–3–201. *See* Utah Code Ann.

§ 76–3–201 (Supp.1983). As enacted, they were both parallel, freestanding subsections and presented the same seeming conflict that is evident today in their current numbering incarnations. Rather than construe them together so as to render section 76–3–201(6)(b) meaningless, I agree with Justice Stewart that they should be read to operate cumulatively. Whenever a sentence is imposed under a minimum mandatory statute, reasons for the sentence choice must be given. But when the court chooses a sentence other than the term of middle severity, it must set forth not only the reason, but also the facts supporting its choice. This construction seems to make the most sense of a rather confused set of provisions. In the present case, the trial court erred when it failed to explain why it chose the term of middle severity.

On the second point, I agree with Justice Stewart that when a prosecutor makes a remark misstating the law, which may prejudice the jury, the proper procedure is for the trial court to give a clarifying instruction. The prosecutor's statement that if Shickles were found not guilty by reason of insanity he would "walk out the door" is a technical misstatement of the law and probably required a curative instruction. However, I conclude that the prosecutor's technical misstatement of the law was adequately cured by the colloquy between counsel before the jury. That misstatement alone, taken in context, would not lead me to vote to reverse because I find any remaining effect of the error harmless. *See State v. Knight*, 734 P.2d 913, 919–20 (Utah 1987).

I am persuaded, however, by Justice Stewart's argument for the proposition that juries should routinely be instructed on the consequences of the alternative verdicts of guilty and mentally ill or not guilty by reason of insanity, regardless of whether the prosecutor has first misstated the legal consequences of the verdicts. The meanings of these two possible verdicts are not self-evident. In *State v. Baker*, 671 P.2d 152 (Utah 1983), *State v. Hansen*, 734 P.2d 421 (Utah 1986), and other cases requiring lesser-included offense instructions,

we have recognized the practical fact that in deciding whether to return a particular verdict, a jury may take into account the real or imagined consequences of that verdict and should be given all verdict choices reasonably supported by the evidence. *See, e.g., Hansen,* 734 P.2d at 424; *Baker,* 671 P.2d at 156–57. Implicit in that line of cases is an assumption that the jury will have some understanding of the relative consequences of the verdicts available to it. When faced with a choice between verdicts of guilty and mentally ill or not guilty by reason of insanity, however, the jury can only guess at the consequences of one versus the other. Therefore, they should be given some guidance.